# MINNESOTA *v.* CARTER

No. 97–1147.   Argued October 6, 1998—Decided December 1, 1998*

---

*Together with *Minnesota* v. *Johns,* also on certiorari to the same court (see this Court's Rule 12.4).

*James C. Backstrom* argued the cause for petitioner. With him on the briefs were *Hubert H. Humphrey III*, Attorney General of Minnesota, and *Phillip D. Prokopowicz.*

*Jeffrey A. Lamken* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Waxman, Acting Assistant Attorney General Keeney*, and *Deputy Solicitor General Dreeben.*

*Bradford Colbert* argued the cause for respondents. With him on the brief were *John M. Stuart, Lawrence Hammerling, Marie L. Wolf*, and *Scott G. Swanson.*†

---

†A brief of *amici curiae* urging reversal was filed for the State of Maryland et al. by *J. Joseph Curran, Jr.*, Attorney General of Maryland, *Annabelle L. Lisic*, Assistant Attorney General, *Alan G. Lance*, Attorney General of Idaho, and *Myrna A. I. Stahman*, Deputy Attorney General, joined by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Daniel E. Lungren* of California, *M. Jane Brady* of Delaware, *Thurbert E. Baker* of Georgia, *Margery S. Bronster* of Hawaii, *Jeffrey A. Modisett* of Indiana,

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Respondents and the lessee of an apartment were sitting in one of its rooms, bagging cocaine. While so engaged they were observed by a police officer, who looked through a drawn window blind. The Supreme Court of Minnesota held that the officer's viewing was a search that violated respondents' Fourth Amendment rights. We hold that no such violation occurred.

James Thielen, a police officer in the Twin Cities' suburb of Eagan, Minnesota, went to an apartment building to investigate a tip from a confidential informant. The informant said that he had walked by the window of a ground-floor apartment and had seen people putting a white powder into bags. The officer looked in the same window through a gap in the closed blind and observed the bagging operation for several minutes. He then notified headquarters, which began preparing affidavits for a search warrant while he returned to the apartment building. When two men left the building in a previously identified Cadillac, the police stopped the car. Inside were respondents Carter and Johns. As the police opened the door of the car to let Johns out, they observed a black, zippered pouch and a handgun, later determined to be loaded, on the vehicle's floor. Carter and Johns were arrested, and a later police search of the vehicle the next day discovered pagers, a scale, and 47 grams of cocaine in plastic sandwich bags.

*Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Peter Verniero* of New Jersey, *Dennis C. Vacco* of New York, *Heidi Heitkamp* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *Jeffrey B. Pine* of Rhode Island, *Charles M. Condon* of South Carolina, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, and *Mark L. Earley* of Virginia.

*Tracey Maclin, Steven R. Shapiro,* and *Lisa B. Kemler* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

After seizing the car, the police returned to apartment 103 and arrested the occupant, Kimberly Thompson, who is not a party to this appeal. A search of the apartment pursuant to a warrant revealed cocaine residue on the kitchen table and plastic baggies similar to those found in the Cadillac. Thielen identified Carter, Johns, and Thompson as the three people he had observed placing the powder into baggies. The police later learned that while Thompson was the lessee of the apartment, Carter and Johns lived in Chicago and had come to the apartment for the sole purpose of packaging the cocaine. Carter and Johns had never been to the apartment before and were only in the apartment for approximately 2½ hours. In return for the use of the apartment, Carter and Johns had given Thompson one-eighth of an ounce of the cocaine.

Carter and Johns were charged with conspiracy to commit a controlled substance crime in the first degree and aiding and abetting in a controlled substance crime in the first degree, in violation of Minn. Stat. §§ 152.021, subds. 1(1), 3(a), 609.05 (1996). They moved to suppress all evidence obtained from the apartment and the Cadillac, as well as to suppress several postarrest incriminating statements they had made. They argued that Thielen's initial observation of their drug packaging activities was an unreasonable search in violation of the Fourth Amendment and that all evidence obtained as a result of this unreasonable search was inadmissible as fruit of the poisonous tree. The Minnesota trial court held that since, unlike the defendant in *Minnesota* v. *Olson*, 495 U. S. 91 (1990), Carter and Johns were not overnight social guests but temporary out-of-state visitors, they were not entitled to claim the protection of the Fourth Amendment against the government intrusion into the apartment. The trial court also concluded that Thielen's observation was not a search within the meaning of the Fourth Amendment. After a trial, Carter and Johns were each convicted of both offenses. The Minnesota Court of Appeals

held that respondent Carter did not have "standing" to object to Thielen's actions because his claim that he was predominantly a social guest was "inconsistent with the only evidence concerning his stay in the apartment, which indicates that he used it for a business purpose—to package drugs." 545 N. W. 2d 695, 698 (1996). In a separate appeal, the Court of Appeals also affirmed Johns' conviction, without addressing what it termed the "standing" issue. *State* v. *Johns*, No. C9–95–1765 (June 11, 1996), App. D–1, D–3 (unpublished).

A divided Minnesota Supreme Court reversed, holding that respondents had "standing" to claim the protection of the Fourth Amendment because they had "'a legitimate expectation of privacy in the invaded place.'" 569 N. W. 2d 169, 174 (1997) (quoting *Rakas* v. *Illinois*, 439 U. S. 128, 143 (1978)). The court noted that even though "society does not recognize as valuable the task of bagging cocaine, we conclude that society does recognize as valuable the right of property owners or leaseholders to invite persons into the privacy of their homes to conduct a common task, be it legal or illegal activity. We, therefore, hold that [respondents] had standing to bring [their] motion to suppress the evidence gathered as a result of Thielen's observations." 569 N. W. 2d, at 176; see also 569 N. W. 2d 180, 181 (1997). Based upon its conclusion that respondents had "standing" to raise their Fourth Amendment claims, the court went on to hold that Thielen's observation constituted a search of the apartment under the Fourth Amendment, and that the search was unreasonable. *Id.*, at 176–179. We granted certiorari, 523 U. S. 1003 (1998), and now reverse.

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas*. 439 U. S., at 139–140. In that case, we held that automobile passengers could not assert the protection of the Fourth Amendment against the

seizure of incriminating evidence from a vehicle where they owned neither the vehicle nor the evidence. *Ibid.* Central to our analysis was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." *Id.,* at 140. Thus, we held that in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i. e.,* one that has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Id.,* at 143–144, and n. 12. See also *Smith* v. *Maryland,* 442 U. S. 735, 740–741 (1979).

The Fourth Amendment guarantees: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Amendment protects persons against unreasonable searches of "their persons [and] houses" and thus indicates that the Fourth Amendment is a personal right that must be invoked by an individual. See *Katz* v. *United States,* 389 U. S. 347, 351 (1967) ("[T]he Fourth Amendment protects people, not places"). But the extent to which the Fourth Amendment protects people may depend upon where those people are. We have held that "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas, supra,* at 143. See also *Rawlings* v. *Kentucky,* 448 U. S. 98, 106 (1980).

The text of the Amendment suggests that its protections extend only to people in "their" houses. But we have held that in some circumstances a person may have a legitimate expectation of privacy in the house of someone else. In *Minnesota* v. *Olson*, 495 U. S. 91 (1990), for example, we decided that an overnight guest in a house had the sort of expectation of privacy that the Fourth Amendment protects. We said:

> "'To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the every day expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. . . .
>
> "From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend." *Id.*, at 98–99.

In *Jones* v. *United States*, 362 U. S. 257, 259 (1960), the defendant seeking to exclude evidence resulting from a search of an apartment had been given the use of the apartment by a friend. He had clothing in the apartment, had slept there "'maybe a night,'" and at the time was the sole occupant of the apartment. But while the holding of *Jones*—that a search of the apartment violated the defend-

ant's Fourth Amendment rights—is still valid, its statement that "anyone legitimately on the premises where a search occurs may challenge its legality," *id.*, at 267, was expressly repudiated in *Rakas* v. *Illinois*, 439 U. S. 128 (1978). Thus, an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.

Respondents here were obviously not overnight guests, but were essentially present for a business transaction and were only in the home a matter of hours. There is no suggestion that they had a previous relationship with Thompson, or that there was any other purpose to their visit. Nor was there anything similar to the overnight guest relationship in *Olson* to suggest a degree of acceptance into the household.* While the apartment was a dwelling place for Thompson, it was for these respondents simply a place to do business.

Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property. "An expectation of privacy in commercial premises, however, is different from, and indeed less than, a similar expectation in an individual's home." *New York* v. *Burger*, 482 U. S. 691, 700 (1987). And while it was a "home" in which respondents were present, it was not their home. Similarly, the Court has held that in some circumstances a worker can claim Fourth Amendment protection over his

---

*JUSTICE GINSBURG's dissent, *post*, at 108–109, would render the operative language in *Minnesota* v. *Olson*, 495 U. S. 91 (1990), almost entirely superfluous. There, we explained the justification for extending Fourth Amendment protection to the overnight visitor: "Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. . . . We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings." *Id.*, at 98–99. If any short-term business visit by a stranger entitles the visitor to share the Fourth Amendment protection of the leaseholder's home, the Court's explanation of its holding in *Olson* was quite unnecessary.

own workplace. See, *e. g., O'Connor* v. *Ortega,* 480 U. S. 709 (1987). But there is no indication that respondents in this case had nearly as significant a connection to Thompson's apartment as the worker in *O'Connor* had to his own private office. See *id.,* at 716–717.

If we regard the overnight guest in *Minnesota* v. *Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely "legitimately on the premises" as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

Because we conclude that respondents had no legitimate expectation of privacy in the apartment, we need not decide whether the police officer's observation constituted a "search." The judgments of the Supreme Court of Minnesota are accordingly reversed, and the cause is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

I join the opinion of the Court because I believe it accurately applies our recent case law, including *Minnesota* v. *Olson,* 495 U. S. 91 (1990). I write separately to express my view that that case law—like the submissions of the parties in this case—gives short shrift to the text of the Fourth Amendment, and to the well and long understood meaning of that text. Specifically, it leaps to apply the fuzzy standard of "legitimate expectation of privacy"—a consideration that

is often relevant to whether a search or seizure covered by the Fourth Amendment is "unreasonable"—to the threshold question whether a search or seizure covered by the Fourth Amendment *has occurred.* If that latter question is addressed first and analyzed under the text of the Constitution as traditionally understood, the present case is not remotely difficult.

The Fourth Amendment protects "[t]he right of the people to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U. S. Const., Amdt. 4 (emphasis added). It must be acknowledged that the phrase "their . . . houses" in this provision is, in isolation, ambiguous. It could mean "their respective houses," so that the protection extends to each person only in his *own* house. But it could also mean "their respective and each other's houses," so that each person would be protected even when visiting the house of someone else. As today's opinion for the Court suggests, however, *ante,* at 88–90, it is not linguistically possible to give the provision the latter, expansive interpretation with respect to "houses" without giving it the same interpretation with respect to the nouns that are parallel to "houses"—"persons, . . . papers, and effects"—which would give me a constitutional right not to have your person unreasonably searched. This is so absurd that it has to my knowledge never been contemplated. The obvious meaning of the provision is that *each* person has the right to be secure against unreasonable searches and seizures in *his own* person, house, papers, and effects.

The founding-era materials that I have examined confirm that this was the understood meaning. (Strangely, these materials went unmentioned by the State and its *amici*—unmentioned even in the State's reply brief, even though respondents had thrown down the gauntlet: "In briefs totaling over 100 pages, the State of Minnesota, the amici 26 attorneys general, and the Solicitor General of the United States of America have not mentioned one word about the history

and purposes of the Fourth Amendment or the intent of the framers of that amendment." Brief for Respondents 12, n. 4.) Like most of the provisions of the Bill of Rights, the Fourth Amendment was derived from provisions already existing in state constitutions. Of the four of those provisions that contained language similar to that of the Fourth Amendment,[1] two used the same ambiguous "their" terminology. See Pa. Const., Art. X (1776) ("That the people have a right to hold themselves, their houses, papers, and possessions free from search and seizure . . ."); Vt. Const., ch. I, § XI (1777) ("That the people have a right to hold themselves, their houses, papers, and possessions free from search or seizure . . ."). The other two, however, avoided the ambiguity by using the singular instead of the plural. See Mass. Const., pt. I, Art. XIV (1780) ("Every subject has a right to be secure from all unreasonable searches, and seizures of his person, his houses, his papers, and all his possessions"); N. H. Const., § XIX (1784) ("Every subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions"). The New York Convention that ratified the Constitution proposed an amendment that would have given every freeman "a right to be secure from all unreasonable searches and seizures of *his* person *his* papers or *his* property," 4 B. Schwartz, The Roots of the Bill of Rights 913 (1980) (reproducing New York proposed amendments, 1778) (emphases added), and the Declaration of Rights that the North Carolina Convention demanded prior to its ratification contained a similar provision protecting a freeman's right against "unreasonable searches and seizures of *his* person, *his* papers and property," *id.*, at 968 (reproducing North Carolina proposed Declaration of Rights, 1778) (emphases added). There is no indication anyone be-

---

[1] Four others contained provisions proscribing general warrants, but unspecific as to the objects of the protection. See Va. Const. § 10 (1776); Del. Const., Art. I, § 6 (1776); Md. Const., Art. XXIII (1776); N. C. Const., Art. XI (1776).

94

lieved that the Massachusetts, New Hampshire, New York, and North Carolina texts, by using the word "his" rather than "their," narrowed the protections contained in the Pennsylvania and Vermont Constitutions.

That "their . . . houses" was understood to mean "their respective houses" would have been clear to anyone who knew the English and early American law of arrest and trespass that underlay the Fourth Amendment. The people's protection against unreasonable search and seizure in their "houses" was drawn from the English common-law maxim, "A man's home is *his* castle." As far back as *Semayne's Case* of 1604, the leading English case for that proposition (and a case cited by Coke in his discussion of the proposition that Magna Carta outlawed general warrants based on mere surmise, 4 E. Coke, Institutes 176–177 (1797)), the King's Bench proclaimed that "the house of any one is not a castle or privilege but for himself, and shall not extend to protect any person who flies to his house." 5 Co. Rep. 91a, 93a, 77 Eng. Rep. 194, 198 (K. B.). Thus Cooley, in discussing Blackstone's statement that a bailiff could not break into a house to conduct an arrest because "every man's house is looked upon by the law to be his castle," 3 W. Blackstone, Commentaries on the Laws of England 288 (1768), added the explanation: "[I]t is the defendant's own dwelling which by law is said to be his castle; for if he be in the house of another, the bailiff or sheriff may break and enter it to effect his purpose . . . ." 3 W. Blackstone, Commentaries on the Laws of England 287, n. 5 (T. Cooley 2d rev. ed. 1872). See also *Johnson* v. *Leigh*, 6 Taunt. 246, 248, 128 Eng. Rep. 1029, 1030 (C. P. 1815) ("[I]n many cases the door of a third person may be broken where that of the Defendant himself cannot; for though every man's house is his own castle, it is not the castle of another man").[2]

---

[2] JUSTICE KENNEDY seeks to cast doubt upon this historical evidence by the carefully generalized assertion that "scholars dispute [the] proper interpretation" of "the English authorities." *Post*, at 99–100 (concurring opinion). In support of this, he cites only a passage from *Payton* v. *New*

Of course this is not to say that the Fourth Amendment protects only the Lord of the Manor who holds his estate in fee simple. People call a house "their" home when legal title

York, 445 U. S. 573 (1980), which noted "a deep divergence among scholars" as to whether *Semayne's Case* accurately described one aspect of the common law of arrest. 445 U. S., at 592. Unfortunately for purposes of its relevance here, that aspect had nothing whatever to do with whether one man's house was another man's castle, but pertained to whether "a constable had the authority to make [a] warrantless [arrest] in the home on mere suspicion of a felony." *Ibid.* The "deep divergence" is a red herring.

JUSTICE KENNEDY also attempts to distinguish *Semayne's Case* on the ground that it arose in "the context of civil process," and so may be "of limited application to enforcement of the criminal law." *Post,* at 100. But of course the distinction cuts in precisely the opposite direction from the one that would support JUSTICE KENNEDY's case: If one man's house is not another man's castle for purposes of serving civil process, it is *a fortiori* not so for purposes of resisting the government's agents in pursuit of crime. *Semayne's Case* itself makes clear that the King's rights are greater: "And all the said books, which prove, that when the process concerns the King, that the Sheriff may break the house, imply that at the suit of the party, the house may not be broken: otherwise the addition (at the suit of the King) would be frivolous." 5 Co. Rep. 92b, 77 Eng. Rep., at 198. See also *id.*, at 92a, 77 Eng. Rep., at 197 ("In every felony the King has interest, and where the King has interest the writ is *non omittas propter aliquam libertatem;* and so the liberty or privilege of a house doth not hold against the King"); *id.*, at 91b, 77 Eng. Rep., at 196 ("J. beats R. so as he is in danger of death, J. flies, and thereupon hue and cry is made, J. retreats into the house of T. they who pursue him, if the house be kept and defended with force . . . may lawfully break the house of T. for it is at the [King's] suit").

Finally, JUSTICE KENNEDY suggests that, whatever the Fourth Amendment meant at the time it was adopted, it does not matter, since "[t]he axiom that a man's home is his castle . . . has acquired over time a power and an independent significance justifying a more general assurance of personal security in one's home, an assurance which has become part of our constitutional tradition." *Post,* at 100. The issue in this case, however, is not "personal security in one's home," but personal security in someone else's home, as to which JUSTICE KENNEDY fails to identify *any* "constitutional tradition" other than the one I have described—leaving us with nothing but his personal assurance that some degree of protection higher than that (and higher than what the people have chosen to provide by law) is "justif[ied]."

is in the bank, when they rent it, and even when they merely occupy it rent free—*so long as they actually live there.* That this is the criterion of the people's protection against government intrusion into "their" houses is established by the leading American case of *Oystead* v. *Shed,* 13 Mass. 520 (1816), which held it a trespass for the sheriff to break into a dwelling to capture a boarder who lived there. The court reasoned that the "inviolability of dwelling-houses" described by Foster, Hale, and Coke extends to "the occupier or any of his family . . . who have their domicile or ordinary residence there," including "a boarder or a servant" "who have made the house *their* home." *Id.,* at 523 (emphasis added). But, it added, "the house shall not be made a sanctuary" for one such as "a stranger, or perhaps a visitor," who "upon a pursuit, take[s] refuge in the house of another," for "the house is not *his* castle; and the officer may break open the doors or windows in order to execute his process." *Ibid.* (emphasis in original).

Thus, in deciding the question presented today we write upon a slate that is far from clean. The text of the Fourth Amendment, the common-law background against which it was adopted, and the understandings consistently displayed after its adoption make the answer clear. We were right to hold in *Chapman* v. *United States,* 365 U. S. 610 (1961), that the Fourth Amendment protects an apartment tenant against an unreasonable search of his dwelling, even though he is only a leaseholder. And we were right to hold in *Bumper* v. *North Carolina,* 391 U. S. 543 (1968), that an unreasonable search of a grandmother's house violated her resident grandson's Fourth Amendment rights because the area searched "was *his* home," *id.,* at 548, n. 11 (emphasis added). We went to the absolute limit of what text and tradition permit in *Minnesota* v. *Olson,* 495 U. S. 91 (1990), when we protected a mere overnight guest against an unreasonable

search of his hosts' apartment. But whereas it is plausible to regard a person's overnight lodging as at least his "temporary" residence, it is entirely impossible to give that characterization to an apartment that he uses to package cocaine. Respondents here were not searched in "their . . . hous[e]" under any interpretation of the phrase that bears the remotest relationship to the well-understood meaning of the Fourth Amendment.

The dissent believes that "[o]ur obligation to produce coherent results" requires that we ignore this clear text and 4-century-old tradition, and apply instead the notoriously unhelpful test adopted in a "benchmar[k]" decision that is 31 years old. *Post,* at 110, citing *Katz* v. *United States,* 389 U. S. 347 (1967). In my view, the only thing the past three decades have established about the *Katz* test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in *Katz,* see *id.,* at 360) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" *id.,* at 361, bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable. When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has *occurred* (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment. That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'" *Ibid.* Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the *Constitution* would extend, leaving further expansion to the good

judgment, not of this Court, but of the people through their representatives in the legislature.[3]

The dissent may be correct that a person invited into someone else's house to engage in a common business (even common monkey business, so to speak) *ought* to be protected against government searches of the room in which that business is conducted; and that persons invited in to deliver milk or pizza (whom the dissent dismisses as "classroom hypotheticals," *post*, at 107, as opposed, presumably, to flesh-and-blood hypotheticals) ought *not* to be protected against government searches of the rooms that they occupy. I am not sure of the answer to those policy questions. But I am sure that the answer is not remotely contained in the Constitution, which means that it is left—as *many*, indeed *most*, important questions are left—to the judgment of state and federal legislators. We go beyond our proper role as judges in a democratic society when we restrict the people's power to

---

[3] The dissent asserts that I "undervalu[e]" the *Katz* Court's observation that "the Fourth Amendment protects people, not places." *Post*, at 111, n. 3, citing 389 U. S., at 351. That catchy slogan would be a devastating response to someone who maintained that *a location* could claim protection of the Fourth Amendment—someone who asserted, perhaps, that "primeval forests have rights, too." Cf. Stone, Should Trees Have Standing?—Toward Legal Rights for Natural Objects, 45 S. Cal. L. Rev. 450 (1972). The issue here, however, is the less druidical one of whether respondents (who are people) have suffered a violation of *their* right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U. S. Const., Amdt. 4. That the Fourth Amendment does not protect places is simply unresponsive to the question whether the Fourth Amendment protects people in other people's homes. In saying this, I do not, as the dissent claims, clash with "the *leitmotif* of Justice Harlan's concurring opinion" in *Katz*, *post*, at 111, n. 3; *au contraire* (or, to be more Wagnerian, *im Gegenteil*), in this regard I am entirely in harmony with that opinion, and it is the dissent that sings from another opera. See 389 U. S., at 361 (Harlan, J., concurring): "As the Court's opinion states, 'the Fourth Amendment protects people, not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.'"

govern themselves over the full range of policy choices that the Constitution has left available to them.

JUSTICE KENNEDY, concurring.

I join the Court's opinion, for its reasoning is consistent with my view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home.

The Fourth Amendment protects "[t]he right of the people to be secure in their . . . houses," and it is beyond dispute that the home is entitled to special protection as the center of the private lives of our people. Security of the home must be guarded by the law in a world where privacy is diminished by enhanced surveillance and sophisticated communication systems. As is well established, however, Fourth Amendment protection, though dependent upon spatial definition, is in essence a personal right. Thus, as the Court held in *Rakas* v. *Illinois*, 439 U. S. 128 (1978), there are limits on who may assert it.

The dissent, as I interpret it, does not question *Rakas* or the principle that not all persons in the company of the property owner have the owner's right to assert the spatial protection. *Rakas*, it is true, involved automobiles, where the necessities of law enforcement permit more latitude to the police than ought to be extended to houses. The analysis in *Rakas* was not conceived, however, as a utilitarian exception to accommodate the needs of law enforcement. The Court's premise was a more fundamental one. Fourth Amendment rights are personal, and when a person objects to the search of a place and invokes the exclusionary rule, he or she must have the requisite connection to that place. The analysis in *Rakas* must be respected with reference to dwellings unless that precedent is to be overruled or so limited to its facts that its underlying principle is, in the end, repudiated.

As to the English authorities that were the historical basis for the Fourth Amendment, the Court has observed that

scholars dispute their proper interpretation. See, *e. g.*, *Payton* v. *New York*, 445 U. S. 573, 592 (1980). *Semayne's Case*, 5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B. 1604), says that "the house of every one is to him as his castle and fortress" and the home is privileged for the homeowner, "his family," and "his own proper goods." *Id.*, at 91b, 93a, 77 Eng. Rep., at 195, 198. Read narrowly, the protections recognized in *Semayne's Case* might have been confined to the context of civil process, and so be of limited application to enforcement of the criminal law. Even if, at the time of *Semayne's Case*, a man's home was not his castle with respect to incursion by the King in a criminal matter, that would not be dispositive of the question before us. The axiom that a man's home is his castle, or the statement attributed to Pitt that the King cannot enter and all his force dares not cross the threshold, see *Miller* v. *United States*, 357 U. S. 301, 307 (1958), has acquired over time a power and an independent significance justifying a more general assurance of personal security in one's home, an assurance which has become part of our constitutional tradition.

It is now settled, for example, that for a routine felony arrest and absent exigent circumstances, the police must obtain a warrant before entering a home to arrest the homeowner. *Payton* v. *New York, supra*, at 576. So, too, the Court held in *Steagald* v. *United States*, 451 U. S. 204 (1981), that, absent exigent circumstances or consent, the police cannot search for the subject of an arrest warrant in the home of a third party, without first obtaining a search warrant directing entry.

These cases strengthen and protect the right of the homeowner to privacy in his own home. They do not speak, however, to the right to claim such a privacy interest in the home of another. See, *e. g.*, *id.*, at 218–219 (noting that the issue in *Steagald* was the homeowner's right to privacy in his own home, and not the right to "claim sanctuary from arrest in the home of a third party"). *Steagald* itself affirmed that,

in accordance with the common law, our Fourth Amendment precedents "recogniz[e] . . . that rights such as those conferred by the Fourth Amendment are personal in nature, and cannot bestow vicarious protection on those who do not have a reasonable expectation of privacy in the place to be searched." *Id.*, at 219.

The homeowner's right to privacy is not at issue in this case. The Court does not reach the question whether the officer's unaided observations of Thompson's apartment constituted a search. If there was in fact a search, however, then Thompson had the right to object to the unlawful police surveillance of her apartment and the right to suppress any evidence disclosed by the search. Similarly, if the police had entered her home without a search warrant to arrest respondents, Thompson's own privacy interests would be violated and she could presumably bring an action under Rev. Stat. § 1979, 42 U. S. C. § 1983, or an action for trespass. Our cases establish, however, that respondents have no independent privacy right, the violation of which results in exclusion of evidence against them, unless they can establish a meaningful connection to Thompson's apartment.

The settled rule is that the requisite connection is an expectation of privacy that society recognizes as reasonable. *Katz* v. *United States*, 389 U. S. 347, 361 (1967) (Harlan, J., concurring). The application of that rule involves consideration of the kind of place in which the individual claims the privacy interest and what expectations of privacy are traditional and well recognized. *Ibid.* I would expect that most, if not all, social guests legitimately expect that, in accordance with social custom, the homeowner will exercise her discretion to include or exclude others for the guests' benefit. As we recognized in *Minnesota* v. *Olson*, 495 U. S. 91 (1990), where these social expectations exist—as in the case of an overnight guest—they are sufficient to create a legitimate expectation of privacy, even in the absence of any property right to exclude others. In this respect, the dis-

sent must be correct that reasonable expectations of the owner are shared, to some extent, by the guest. This analysis suggests that, as a general rule, social guests will have an expectation of privacy in their host's home. That is not the case before us, however.

In this case respondents have established nothing more than a fleeting and insubstantial connection with Thompson's home. For all that appears in the record, respondents used Thompson's house simply as a convenient processing station, their purpose involving nothing more than the mechanical act of chopping and packing a substance for distribution. There is no suggestion that respondents engaged in confidential communications with Thompson about their transaction. Respondents had not been to Thompson's apartment before, and they left it even before their arrest. The Minnesota Supreme Court, which overturned respondents' convictions, acknowledged that respondents could not be fairly characterized as Thompson's "guests." 569 N. W. 2d 169, 175–176 (1997); see also 545 N. W. 2d 695, 698 (Minn. Ct. App. 1996) (noting that Carter's only evidence—that he was there to package cocaine—was inconsistent with his claim that "he was predominantly a social guest" in Thompson's apartment).

If respondents here had been visiting 20 homes, each for a minute or two, to drop off a bag of cocaine and were apprehended by a policeman wrongfully present in the 19th home; or if they had left the goods at a home where they were not staying and the police had seized the goods in their absence, we would have said that *Rakas* compels rejection of any privacy interest respondents might assert. So it does here, given that respondents have established no meaningful tie or connection to the owner, the owner's home, or the owner's expectation of privacy.

We cannot remain faithful to the underlying principle in *Rakas* without reversing in this case, and I am not persuaded that we need depart from it to protect the homeown-

er's own privacy interests. Respondents have made no persuasive argument that we need to fashion a *per se* rule of home protection, with an automatic right for all in the home to invoke the exclusionary rule, in order to protect homeowners and their guests from unlawful police intrusion. With these observations, I join the Court's opinion.

JUSTICE BREYER, concurring in the judgment.

I agree with JUSTICE GINSBURG that respondents can claim the Fourth Amendment's protection. Petitioner, however, raises a second question, whether under the circumstances Officer Thielen's observation made "from a public area outside the curtilage of the residence" violated respondents' Fourth Amendment rights. See Pet. for Cert. i. In my view, it did not.

I would answer the question on the basis of the following factual assumptions, derived from the evidentiary record presented here: (1) On the evening of May 15, 1994, an anonymous individual approached Officer Thielen, telling him that he had just walked by a nearby apartment window through which he had seen some people bagging drugs; (2) the apartment in question was a garden apartment that was partly below ground level; (3) families frequently used the grassy area just outside the apartment's window for walking or for playing; (4) members of the public also used the area just outside the apartment's window to store bicycles; (5) in an effort to verify the tipster's information, Officer Thielen walked to a position about 1 to 1½ feet in front of the window; (6) Officer Thielen stood there for about 15 minutes looking down through a set of venetian blinds; (7) what he saw, namely, people putting white powder in bags, verified the account he had heard; and (8) he then used that information to help obtain a search warrant. See App. E–1 to E–3, E–9 to E–12, G–8 to G–9, G–12 to G–14, G–26, G–29 to G–30, G–32, G–39 to G–40, G–67 to G–71, I–2 to I–3.

The trial court concluded that persons then within Ms. Thompson's kitchen "did not have an expectation of privacy from the location where Officer Thielen made his observations . . . ," No. K9–94–0985 (Minn. Dist. Ct., Dec. 16, 1994), App. E–10 (unpublished), because Officer Thielen stood outside the apartment's "curtilage" when he made his observations, *id.*, at E–10 to E–12. And the Minnesota Supreme Court, while finding that Officer Thielen had violated the Fourth Amendment, did not challenge the trial court's curtilage determination; indeed, it assumed that Officer Thielen stood outside the apartment's curtilage. 569 N. W. 2d 169, 177, and n. 10 (1997) (stating "it is plausible that Thielen's presence just outside the apartment window was legitimate").

Officer Thielen, then, stood at a place used by the public and from which one could see through the window into the kitchen. The precautions that the apartment's dwellers took to maintain their privacy would have failed in respect to an ordinary passerby standing in that place. Given this Court's well-established case law, I cannot say that the officer engaged in what the Constitution forbids, namely, an "unreasonable search." See, *e. g.*, *Florida* v. *Riley*, 488 U. S. 445, 448 (1989) (finding observation of greenhouse from helicopters in public airspace permissible, even though owners had enclosed greenhouse on two sides, relied on bushes blocking ground-level observations through remaining two sides, and covered 90% of roof); *California* v. *Ciraolo*, 476 U. S. 207, 209 (1986) (finding observation of backyard from plane in public airspace permissible despite 6-foot outer fence and 10-foot inner fence around backyard); cf. *Katz* v. *United States*, 389 U. S. 347, 351 (1967).

The Minnesota Supreme Court reached a different conclusion in part because it believed that Officer Thielen had engaged in unusual activity, that he "climbed over some bushes, crouched down and placed his face 12 to 18 inches from the window," and in part because he saw into the apartment

through "a small gap" in blinds that were drawn. 569 N. W. 2d, at 177–178. But I would not here determine whether the crouching and climbing or "plac[ing] his face" makes a constitutional difference because the record before us does not contain support for those factual conclusions. That record indicates that Officer Thielen would not have needed to, and did not, climb over bushes or crouch. See App. G–12 to G–13, G–27 to G–30, G–43 to G–46 (Officer Thielen's testimony); *id.*, at I–3 (photograph of apartment building). And even though the primary evidence consists of Officer Thielen's own testimony, who else could have known? Given the importance of factual nuance in this area of constitutional law, I would not determine the constitutional significance of factual assertions that the record denies. Cf. *Walters* v. *National Assn. of Radiation Survivors*, 473 U. S. 305, 342 (1985) (Brennan, J., dissenting) (citing *Brown* v. *Chote*, 411 U. S. 452, 457 (1973)).

Neither can the matter turn upon "gaps" in drawn blinds. Whether there were holes in the blinds or they were simply pulled the "wrong way" makes no difference. One who lives in a basement apartment that fronts a publicly traveled street, or similar space, ordinarily understands the need for care lest a member of the public simply direct his gaze downward.

Putting the specific facts of this case aside, there is a benefit to an officer's decision to confirm an informant's tip by observing the allegedly illegal activity from a public vantage point. Indeed, there are reasons why Officer Thielen stood in a public place and looked through the apartment window. He had already received information that a crime was taking place in the apartment. He intended to apply for a warrant. He needed to verify the tipster's credibility. He might have done so in other ways, say, by seeking general information about the tipster's reputation and then obtaining a warrant and searching the apartment. But his chosen method—observing the apartment from a public vantage point—would

more likely have saved an innocent apartment dweller from a physically intrusive, though warrant-based, search if the constitutionally permissible observation revealed no illegal activity.

For these reasons, while agreeing with JUSTICE GINSBURG, I also concur in the Court's judgment reversing the Minnesota Supreme Court.

JUSTICE GINSBURG, with whom JUSTICE STEVENS and JUSTICE SOUTER join, dissenting.

The Court's decision undermines not only the security of short-term guests, but also the security of the home resident herself. In my view, when a homeowner or lessee personally invites a guest into her home to share in a common endeavor, whether it be for conversation, to engage in leisure activities, or for business purposes licit or illicit, that guest should share his host's shelter against unreasonable searches and seizures.

I do not here propose restoration of the "legitimately on the premises" criterion stated in *Jones* v. *United States*, 362 U. S. 257, 267 (1960), for the Court rejected that formulation in *Rakas* v. *Illinois*, 439 U. S. 128, 142 (1978), as it did the "automatic standing rule" in *United States* v. *Salvucci*, 448 U. S. 83, 95 (1980). First, the disposition I would reach in this case responds to the unique importance of the home— the most essential bastion of privacy recognized by the law. See *United States* v. *Karo*, 468 U. S. 705, 714 (1984) ("[P]rivate residences are places in which the individual normally expects privacy free of governmental intrusion not authorized by a warrant . . . . Our cases have not deviated from this basic Fourth Amendment principle."); *Payton* v. *New York*, 445 U. S. 573, 589 (1980) ("The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home."). Second, even within the home itself, the

position to which I would adhere would not permit "a casual visitor who has never seen, or been permitted to visit, the basement of another's house to object to a search of the basement if the visitor happened to be in the kitchen of the house at the time of the search." *Rakas*, 439 U. S., at 142. Further, I would here decide only the case of the homeowner who chooses to share the privacy of her home and her company with a guest, and would not reach classroom hypotheticals like the milkman or pizza deliverer.

My concern centers on an individual's choice to share her home and her associations there with persons she selects. Our decisions indicate that people have a reasonable expectation of privacy in their homes in part because they have the prerogative to exclude others. See *id.*, at 149 (legitimate expectation of privacy turns in large part on ability to exclude others from place searched). The power to exclude implies the power to include. See, *e. g.*, Coombs, Shared Privacy and the Fourth Amendment, or the Rights of Relationships, 75 Calif. L. Rev. 1593, 1618 (1987) ("One reason we protect the legal right to exclude others is to empower the owner to choose to share his home or other property with his intimates."); Alschuler, Interpersonal Privacy and the Fourth Amendment, 4 N. Ill. U. L. Rev. 1, 13 (1983) ("[O]ne of the main rights attaching to property is the right to share its shelter, its comfort and its privacy with others."). Our Fourth Amendment decisions should reflect these complementary prerogatives.

A homedweller places her own privacy at risk, the Court's approach indicates, when she opens her home to others, uncertain whether the duration of their stay, their purpose, and their "acceptance into the household" will earn protection. *Ante*, at 90.[1] It remains textbook law that "[s]earches and seizures inside a home without a warrant are presumptively

---

[1] At oral argument, counsel for petitioner informed the Court that the lessee of the apartment was charged, tried, and convicted of the same crimes as respondents. Tr. of Oral Arg. 10–11.

unreasonable absent exigent circumstances." *Karo*, 468 U. S., at 714–715. The law in practice is less secure. Human frailty suggests that today's decision will tempt police to pry into private dwellings without warrant, to find evidence incriminating guests who do not rest there through the night. See Simien, The Interrelationship of the Scope of the Fourth Amendment and Standing to Object to Unreasonable Searches, 41 Ark. L. Rev. 487, 539 (1988) ("[I]f the police have no probable cause, they have everything to gain and nothing to lose if they search under circumstances where they know that at least one of the potential defendants will not have standing."). *Rakas* tolerates that temptation with respect to automobile searches. See Ashdown, The Fourth Amendment and the "Legitimate Expectation of Privacy," 34 Vand. L. Rev. 1289, 1321 (1981) (criticizing *Rakas* as "present[ing] a framework in which there may be nothing to lose and something to gain by the illegal search of a car that carries more than one occupant"); see also *Rakas*, 439 U. S., at 169 (White, J., dissenting) ("After this decision, police will have little to lose by unreasonably searching vehicles occupied by more than one person."). I see no impelling reason to extend this risk into the home. See *Silverman* v. *United States*, 365 U. S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."). As I see it, people are not genuinely "secure in their . . . houses . . . against unreasonable searches and seizures," U. S. Const., Amdt. 4, if their invitations to others increase the risk of unwarranted governmental peering and prying into their dwelling places.

Through the host's invitation, the guest gains a reasonable expectation of privacy in the home. *Minnesota* v. *Olson*, 495 U. S. 91 (1990), so held with respect to an overnight guest. The logic of that decision extends to shorter term guests as well. See 5 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.3(b), p. 137 (3d ed.

1996) ("[I]t is fair to say that the *Olson* decision lends considerable support to the claim that shorter-term guests also have standing."). Visiting the home of a friend, relative, or business associate, whatever the time of day, "serves functions recognized as valuable by society." *Olson*, 495 U. S., at 98. One need not remain overnight to anticipate privacy in another's home, "a place where [the guest] and his possessions will not be disturbed by anyone but his host and those his host allows inside." *Id.*, at 99. In sum, when a homeowner chooses to share the privacy of her home and her company with a short-term guest, the twofold requirement "emerg[ing] from prior decisions" has been satisfied: Both host and guest "have exhibited an actual (subjective) expectation of privacy"; that "expectation [is] one [our] society is prepared to recognize as 'reasonable.'" *Katz* v. *United States*, 389 U. S. 347, 361 (1967) (Harlan, J., concurring).[2]

As the Solicitor General acknowledged, the illegality of the host-guest conduct, the fact that they were partners in crime, would not alter the analysis. See Tr. of Oral Arg.

---

[2] In his concurring opinion, JUSTICE KENNEDY maintains that respondents here lacked "an expectation of privacy that society recognizes as reasonable," *ante*, at 101, because they "established nothing more than a fleeting and insubstantial connection" with the host's home, *ante*, at 102. As the Minnesota Supreme Court reported, however, the stipulated facts showed that respondents were inside the apartment with the host's permission, remained inside for at least 2½ hours, and, during that time, engaged in concert with the host in a collaborative venture. See 569 N. W. 2d 169, 175–176 (1997). These stipulated facts—which scarcely resemble a stop of a minute or two at the 19th of 20 homes to drop off a packet, see *ante*, at 102—securely demonstrate that the host intended to share her privacy with respondents, and that respondents, therefore, had entered into the homeland of Fourth Amendment protection. While I agree with the Minnesota Supreme Court that, under the rule settled since *Katz*, the reasonableness of the expectation of privacy controls, not the visitor's status as social guest, invitee, licensee, or business partner, 569 N. W. 2d, at 176, I think it noteworthy that five Members of the Court would place under the Fourth Amendment's shield, at least, "almost all social guests," *ante*, at 99 (KENNEDY, J., concurring).

22–23.  In *Olson*, for example, the guest whose security this Court's decision shielded stayed overnight while the police searched for him.   495 U. S., at 93–94.   The Court held that the guest had Fourth Amendment protection against a warrantless arrest in his host's home despite the guest's involvement in grave crimes (first-degree murder, armed robbery, and assault).   Other decisions have similarly sustained Fourth Amendment pleas despite the criminality of the defendants' activities.   See, *e. g.*, *Payton*, 445 U. S., at 583–603 (murder and armed robbery); *Katz*, 389 U. S., at 348–359 (telephoning across state lines to place illegal wagers); *Silverman*, 365 U. S., at 508–512 (gambling offenses).   Indeed, it must be this way.   If the illegality of the activity made constitutional an otherwise unconstitutional search, such Fourth Amendment protection, reserved for the innocent only, would have little force in regulating police behavior toward either the innocent or the guilty.

Our leading decision in *Katz* is key to my view of this case. There, we ruled that the Government violated the petitioner's Fourth Amendment rights when it electronically recorded him transmitting wagering information while he was inside a public telephone booth.   389 U. S., at 353.   We were mindful that "the Fourth Amendment protects people, not places," *id.*, at 351, and held that this electronic monitoring of a business call "violated the privacy upon which [the caller] justifiably relied while using the telephone booth," *id.*, at 353. Our obligation to produce coherent results in this often visited area of the law requires us to inform our current expositions by benchmarks already established.   As Justice Harlan explained in his dissent in *Poe* v. *Ullman*, 367 U. S. 497, 544 (1961):

> "Each new claim to Constitutional protection must be considered against a background of Constitutional purposes, as they have been rationally perceived and historically developed.   Though we exercise limited and

sharply restrained judgment, yet there is no 'mechanical yardstick,' no 'mechanical answer.' The decision of an apparently novel claim must depend on grounds which follow closely on well-accepted principles and criteria. The new decision must take 'its place in relation to what went before and further [cut] a channel for what is to come.'" *Ibid.* (quoting *Irvine* v. *California,* 347 U. S. 128, 147 (1954) (Frankfurter, J., dissenting)).

The Court's decision in this case veers sharply from the path marked in *Katz.* I do not agree that we have a more reasonable expectation of privacy when we place a business call to a person's home from a public telephone booth on the side of the street, see *Katz,* 389 U. S., at 353, than when we actually enter that person's premises to engage in a common endeavor.[3]

---

[3] JUSTICE SCALIA's lively concurring opinion deplores our adherence to *Katz.* In suggesting that we have elevated Justice Harlan's concurring opinion in *Katz* to first place, see *ante,* at 97, JUSTICE SCALIA undervalues the clear opinion of the Court that "the Fourth Amendment protects people, not places," 389 U. S., at 351. That core understanding is the *leitmotif* of Justice Harlan's concurring opinion. One cannot avoid a strong sense of *déjà vu* on reading JUSTICE SCALIA's elaboration. It so vividly recalls the opinion of Justice Black *in dissent* in *Katz.* See 389 U. S., at 365 (Black, J., dissenting) ("While I realize that an argument based on the meaning of words lacks the scope, and no doubt the appeal, of broad policy discussions and philosophical discourses . . . , for me the language of the Amendment is the crucial place to look."); *id.,* at 373 ("[B]y arbitrarily substituting the Court's language . . . for the Constitution's language the Court has made the Fourth Amendment its vehicle for holding all laws violative of the Constitution which offend the Court's broadest concept of privacy."); *ibid.* ("I will not distort the words of the Amendment in order to 'keep the Constitution up to date' or 'to bring it into harmony with the times.'"). JUSTICE SCALIA relies on what he deems "clear text," *ante,* at 97, to argue that the Fourth Amendment protects people from searches only in the places where they live, *ante,* at 96. Again, as Justice Stewart emphasized in the majority opinion in *Katz,* which *stare decisis* and reason require us to follow, "the Fourth Amendment protects people, not places." 389 U. S., at 351.

\* \* \*

For the reasons stated, I dissent from the Court's judgment, and would retain judicial surveillance over the warrantless searches today's decision allows.