RENDERED: NOVEMBER 5, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1208-MR

CHRISTOPHER G. TEAGUE                                             APPELLANT

v.

APPEAL FROM WEBSTER CIRCUIT COURT
HONORABLE C. RENE' WILLIAMS, JUDGE
ACTION NO. 19-CR-00050

COMMONWEALTH OF KENTUCKY                                          APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; GOODWINE AND McNEILL, JUDGES.

CLAYTON, CHIEF JUDGE: Christopher G. Teague ("Teague") entered a conditional guilty plea to drug charges and the Webster Circuit Court sentenced him to a one-year term of imprisonment. Teague now appeals from the Webster Circuit Court's denial of his motion to suppress certain evidence seized in the case which was collected from another individual's residence. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On November 15, 2019, the Webster County grand jury indicted Teague for first-degree possession of a controlled substance (methamphetamine), possession of synthetic drugs, possession of drug paraphernalia, and possession of marijuana. On January 1, 2020, Teague filed a motion to suppress certain evidence collected from the site of his arrest and the circuit court held a suppression hearing on February 6, 2020.

Todd Jones, Chief of the Providence Police Department, testified that on September 4, 2019, he responded to a complaint of loud music coming from a residence located at 419 South Broadway in Providence, Kentucky at approximately 11:00 a.m. Chief Jones was familiar with the residence and its sole owner and occupant, Louis Wayne Mitchell. Chief Jones and Mitchell knew each other from church and a recovery center. Moreover, Chief Jones testified that he had been at Mitchell's residence five days before to arrest two other individuals who had been caught trespassing on the property. Chief Jones testified that Mitchell had indicated to him that Mitchell had been having problems with other people taking advantage of him and entering his home without his permission. He requested that Chief Jones check on his residence when he was in the area because of the problems with unwanted guests. Moreover, Chief Jones testified that Mitchell had told Chief Jones to feel free "to go in and see who's in there" any

time that he was in the area. Mitchell further indicated to Chief Jones that, while Mitchell still owned the residence, he discontinued residing at the home out of fear because of the constant trespassers and other issues with the property.

Chief Jones further testified that, when he arrived at Mitchell's residence in response to the noise complaint, he noticed the odor of marijuana permeating the area several feet before he even arrived at the structure of the home. Chief Jones knocked on the door and was met by Teague, a person with whom he was also familiar. Chief Jones testified that Teague immediately stated something to the effect of "it is Todd Jones" and slammed the door. Chief Jones heard rustling inside of the residence and opened the door. When he did so, Chief Jones saw two additional men – Robert Jackson and Michael Grey. In plain view near the men were several still-smoldering marijuana cigarettes, various items of drug paraphernalia, and a baggie with a cut corner containing methamphetamine. The evidence was collected, and Teague, Jackson, and Grey were each arrested and charged with drug offenses.

Jackson testified next. He testified that he was "pretty close friends" with Mitchell and that he had known Mitchell for about four or five years. Jackson further testified that, on the day in question, Mitchell had invited Jackson into his residence. Jackson further testified that five to ten minutes before Chief Jones arrived at the residence, Mitchell had left the residence to obtain a pack of

cigarettes and had instructed Jackson not to let anyone inside of the residence and to lock the door to the residence if Jackson left before Mitchell returned. Jackson further testified that he had been at Mitchell's residence many times before while Mitchell was not home to watch the home and make sure that people did not come into the residence.

Teague was the next witness to testify and stated that he had known Mitchell for virtually his entire life. Teague also testified that Mitchell had invited Teague into his home and had permitted him to be at his residence until Mitchell returned from getting cigarettes from Mitchell's mother's home. Teague additionally indicated that he had previously been at Mitchell's residence when Mitchell was not there. At the end of the hearing, the trial court took the matter under advisement but later subpoenaed Mitchell to testify before ruling on the suppression motion.

On March 5, 2020, the trial court conducted a second hearing wherein Mitchell was the only witness. Mitchell testified that he had previously requested that Chief Jones keep an eye on his house but only concerning one specific person – Aaron Conrad – who was continually trespassing on his property. He further testified that, on September 4, 2019, Jackson, who was his next-door neighbor, came to Mitchell's home around 8:00 a.m. or 9:00 a.m. Mitchell testified that he stayed with Jackson for a while but then told him that he needed to leave his home

to run an errand. Mitchell stated that he consented to Jackson remaining at his home if Jackson agreed to lock the front door when he left Mitchell's residence. Mitchell also said that he told Jackson that he was in charge of the house. Mitchell testified that neither Teague nor Grey were at his home when Mitchell left to run his errand and that he did not invite those two individuals to his home. Thereafter, Mitchell indicated that he went to a pawn shop and was gone for approximately an hour. Mitchell testified that none of the individuals had previously rented the residence from him or spent the night at the residence. However, Mitchell testified that Teague had visited his residence before.

At the end of the second hearing, the trial court gave both parties time to submit arguments and supporting authority on the matter. Teague filed a brief in support of his motion to suppress, arguing that he had a reasonable expectation of privacy in Mitchell's residence as Jackson's guest and that Chief Jones's warrantless entry into the residence was unlawful. The Commonwealth filed a memorandum in opposition to the motion to suppress, arguing that Teague did not have the standing necessary to challenge the search of a home in which he had no ownership or possessory interest. The Commonwealth also argued that the warrantless entry was lawful because Chief Jones had Mitchell's consent to enter his residence.

On July 8, 2020, the trial court entered an order denying the motion to suppress and holding that all three defendants, including Teague, had not met their burden of establishing standing to challenge the search. The trial court explained:

> By his own testimony, Mr. Teague testified he just 'stopped by the residence on his way to the store.' There has been no evidence submitted that Mr. Teague had any possessory interest in the property and no evidence Mr. Mitchell or (Mr. Jackson) granted him permission to be present. Based on the relevant law discussed below regarding standing and the relevant facts submitted, the Court finds Defendant Christopher Teague has no standing to challenge this search and his motion is DENIED.

The trial court further found that even if Teague had established his standing to claim a Fourth Amendment violation, he would not have been entitled to suppression of the evidence because Chief Jones had Mitchell's consent to enter his residence.

On September 3, 2020, Teague entered a conditional guilty plea to the charges of first-degree possession of a controlled substance, possession of synthetic drugs, and possession of drug paraphernalia. In exchange for Teague's plea, the Commonwealth dismissed the marijuana charge. Teague waived a separate sentencing hearing and was sentenced per the Commonwealth's recommendation to one year of imprisonment.

This appeal followed.

## ANALYSIS

An appellate court's review of the denial of a motion to suppress involves a two-step process. First, the appellate court must determine whether the trial court's findings of fact are supported by substantial evidence. *Warick v. Commonwealth*, 592 S.W.3d 276, 287 (Ky. 2019). If so, they are conclusive. *Id.* Next, the appellate court conducts a *de novo* review to determine whether the trial court properly applied the law to those facts. *Id.*

Teague's first argument on appeal is that the trial court erred in its determination that Teague did not have standing because he did not have a reasonable expectation of privacy in Mitchell's residence. As noted by Teague in his brief, our Supreme Court recently reminded "the bench and bar that a 'standing' analysis is improper under Fourth Amendment substantive law." *Id.* at 280. The logic is that all criminal defendants subjected to a search or seizure by law enforcement officials technically have "standing" to bring a Fourth Amendment challenge. *Id.* at 280-82.

Thus, the determination of an alleged Fourth Amendment violation requires consideration of the merits of the claim. *Id.* at 283. The first step in the analysis is to determine "whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Id.* (internal quotation marks and citations

omitted). As discussed by the United States Supreme Court in *Minnesota v. Carter*:

> a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.

525 U.S. 83, 88, 119 S. Ct. 469, 472, 142 L. Ed. 2d 373 (1998) (internal quotation marks and citations omitted). Thus, the individual must establish both that he had an actual, subjective expectation of privacy in the area searched and that that expectation is "one that society is prepared to recognize as 'reasonable.'" *Smith v. Maryland*, 442 U.S. 735, 740, 99 S. Ct. 2577, 2580, 61 L. Ed. 2d 220 (1979) (citations omitted).

In sum, the *Carter* Court emphasized that "the extent to which the Fourth Amendment protects people may depend upon where those people are." *Carter*, 525 U.S. at 88, 119 S. Ct. at 473. While "an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Carter*, 525 U.S. at 90, 119 S. Ct. at 473.

Turning to applicable Kentucky case law, the Kentucky Supreme Court decision in *Ordway v. Commonwealth*, while decided before *Warick* and

couched in terms of "standing," discussed the concept of an individual having a "legitimate expectation of privacy" in a specific premises. 352 S.W.3d 584, 592 (Ky. 2011) (citation omitted). As in this case, the defendant in *Ordway* claimed that he had a legitimate expectation of privacy in a residence owned by another individual – specifically, his girlfriend. *Id.* In its analysis, the Court noted that, while the record indicated that the defendant regularly visited the residence, no evidence existed that the defendant "legally resided" with his girlfriend, "enjoyed unrestricted access" to her residence, possessed a key to the residence, or paid any bills associated with the residence. *Id.* Consequently, the Court determined that "no evidence was presented to establish a legitimate expectation of privacy. Therefore, [the defendant] cannot now complain of a Fourth Amendment violation." *Id.* (citations omitted).

In this case, based on the foregoing discussion and standards, Teague cannot claim a Fourth Amendment violation because he did not have a reasonable or legitimate expectation of privacy in Mitchell's residence. Teague admitted that he did not live at the residence and there was no evidence that he kept belongings there or that Mitchell even knew Teague was at his residence or had consented to him being there on the day in question. Like the defendant in *Ordway*, Teague did not have unrestricted access to Mitchell's residence, he did not have a key to the residence, nor did he pay any bills associated with the residence. Further, unlike

the defendant in *Ordway*, there was no evidence that Teague even occasionally spent the night or kept any belongings at Mitchell's residence. Because the defendant in *Ordway* could not complain of a Fourth Amendment violation, neither can Teague in the case *sub judice*.

Teague further argues that *Ordway* is distinguishable because the *Ordway* defendant's connection to the property in that case was "attenuated," and that Jackson, by virtue of being the "caretaker" of Mitchell's home, would have a reasonable expectation of privacy in the living room and such expectation would flow to Teague as Jackson's guest. We disagree. First, the record contained no evidence that Teague was Jackson's guest at all, as Jackson never indicated that he had invited Teague to the residence. Further, by his own testimony, Teague stated that he just "stopped by the residence on his way to the store." Moreover, we disagree with Teague's characterization of the defendant's connection to his girlfriend's residence in *Ordway* as being "attenuated." Rather, we find it to be far more compelling than any connection that either Jackson or Teague could claim to have with Mitchell's residence. While Ordway kept belongings and spent the night at his girlfriend's residence, no evidence was presented that either Jackson or Teague had ever stored anything or spent the night at Mitchell's residence. *Ordway*, 352 S.W.3d at 587, 592.

Moreover, even if one could describe Jackson as the "caretaker" of Mitchell's property for however brief a period during the events of that day, the Fourth Amendment does not automatically apply. In *Hawley v. Commonwealth*, 435 S.W.3d 61, 66 (Ky. App. 2014), a panel of this Court held that Hawley could not challenge the search of his grandfather's home and garage, even though Hawley had occasionally spent the night at the residence to protect it from break-ins and had otherwise served in a caretaking role in terms of mowing the yard and working in the house. *Id.* The Court determined that "[b]ecause Hawley did not have any type of possessory interest in the house or garage, he did not have a legitimate expectation of privacy and therefore was precluded from challenging the search." *Id.*

Under *Hawley*, Jackson would have no legitimate expectation of privacy in the extremely limited role that he may have played in taking care of Mitchell's residence, and therefore he was precluded from challenging the search. Thus, Jackson could not pass on to Teague a reasonable expectation of privacy that he did not enjoy. Further, Jackson testified that Mitchell specifically instructed Jackson not to let anyone else into his residence. Such fact alone would negate any implicit authority that Jackson may or may not have been given by Mitchell to permit Teague to enter the residence. Given Jackson's tenuous – albeit tolerated – status at Mitchell's residence on that day, Teague was – at best – the guest of a

guest. That is a far cry from the "acceptance into the household" referred to by the *Carter* Court. 525 U.S. at 90, 119 S. Ct. at 473. Therefore, we affirm the trial court as to this issue.

Because we have determined that Teague had no reasonable expectation of privacy in Mitchell's home, we need not address Teague's second argument on appeal as to whether Mitchell consented to the search of his residence.

## CONCLUSION

For the foregoing reasons, we affirm the Webster Circuit Court's order denying Teague's motion to suppress.

ALL CONCUR.

BRIEF FOR APPELLANT:

Jennifer Wade
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Aspen Roberts
Assistant Attorney General
Frankfort, Kentucky