**UNITED STATES of America, Plaintiff,**

v.

**Margarito FLORES, Defendant.**

**No. CR–3–97–074(1).**

United States District Court, S.D. Ohio, Western Division.

June 28, 1999.

J. Richard Chema, Asst. U.S. Atty., Dayton, OH, for U.S., Plaintiff.

Daniel Joseph O'Brien, O'Brien Law Offices, Dayton, OH, Sharon Trigo, Laredo, TX, Emilio Davila, Jr., Laredo, TX, for Margarito Flores, Defendant.

DECISION AND ENTRY OVERRULING, AS MOOT, DEFENDANT'S MOTION FOR LEAVE TO JOIN MOTION OF DEFENDANT HAROLD COLE (DOC. # 46); DECISION AND ENTRY OVERRULING IN PART AND OVERRULING, AS MOOT, IN PART DEFENDANT'S AMENDED MOTION TO SUPPRESS EVIDENCE (DOC. # 94)

RICE, Chief Judge.

The Defendant Margarito Flores ("Defendant" or "Flores") is charged in the

Superseding Indictment (Doc. # 56) with conspiring to distribute and to possess with intent to distribute cocaine and marijuana, in violation of 21 U.S.C. § 846. In addition, Flores is charged with one count of possessing with intent to distribute cocaine and one count of possessing with intent to distribute marijuana, both in violation of 21 U.S.C. § 841. Flores is also charged with violating 18 U.S.C. § 1952, by traveling in interstate commerce, with the intent of furthering an illegal activity, to wit: the distribution of cocaine and marijuana.[1]

This case is now before the Court on Flores' Amended Motion to Suppress Evidence (Doc. # 94).[2] With that motion, Flores requests that the Court suppress the evidence that was seized from the residence of Co–Defendant Harold Cole ("Cole"), located at 3221 Riverside Drive, Dayton, Ohio ("3221 Riverside"), when a search warrant was executed at that location on September 10, 1997.[3] The Court conducted an oral and evidentiary hearing on Flores' motion, on May 26, 1998, and October 15, 1998. In accordance with briefing schedules established by the Court (see Docs. # 140 and # 155), the parties have filed post-hearing memoranda. See Docs. 146, 147, 149, 156 and 157. On March 23, 1999, the Court heard oral arguments from the parties on Flores' Amended Motion to Suppress Evidence (Doc. # 94). The Court now rules upon that motion.

On August 26, 1997, Randall Warren ("Warren"), a sergeant in the narcotics bureau of the Dayton Police Department, received a telephone call from an agent, employed by the United States Customs Service in its Cincinnati office. That agent informed Warren that a private aircraft was flying from Laredo, Texas, to the Dayton International Airport.[4] Warren went to that airport and observed the aircraft in question. He subsequently learned that Flores was the plane's passenger and that he was staying at the Quality Inn and Suites ("Quality Inn"), located on Needmore Road, in Dayton. Officers observed Flores at that motel, in the company of Cole; however, due to budget constraints within the Dayton Police Department, Warren terminated his surveillance of Flores at around midnight on August 26th. He subsequently asked employees at the Quality Inn to inform him if Flores were to return to that establishment.

At approximately 4:00 a.m., on September 10, 1997, an employee at the Quality Inn telephoned Warren to tell him that Flores had returned. Officers set up surveillance at the Quality Inn. At approximately noon on September 10th, Flores got into a blue Ford LTD, with Illinois license plates, and proceeded to an address on Oneida Drive, where he made contact with someone in a black Chevrolet Suburban. Thereafter, the officers followed Flores to a Denny's Restaurant, located on North Dixie Drive, where he purchased a newspaper, ate lunch and made a number

1. The Superseding Indictment also seeks the forfeiture of any interest Flores may have in a 1973 Cessna 421B Golden Eagle aircraft and $8,200.00 in United States currency, which was seized on or about September 10, 1997, from 3221 Riverside Drive, Dayton, Ohio.

2. Previously, Flores had filed a motion seeking to join in the suppression motion filed by his Co–Defendant Harold Cole. See Doc. # 46. Since Flores, with his Amended Motion to Suppress Evidence, seeks the suppression of the same evidence as did Cole, the Court overrules, as moot, Flores' Motion for Leave to Join Motion of Defendant Harold Cole (Doc. # 46).

3. With that motion, Flores also requests that the Court suppress any evidence that was seized from him or the vehicle in which he was a passenger, when, on September 10, 1997, that vehicle was stopped and he was seized. Since there is no indication that any evidence was seized from either Flores or the automobile on that date, the Court overrules, as moot, the aspect of Flores' Amended Motion to Suppress Evidence (Doc. # 94), with which he seeks suppression of such evidence.

4. The Cincinnati Customs agent had received that information from an agent with the Laredo office of the Customs Service.

of telephone calls. Thereafter, the officers followed Flores to Cole's residence at 3221 Riverside Drive ("3221 Riverside"), in Dayton, where he backed the automobile that he was driving into the driveway. Flores got out of his vehicle and was greeted by Cole. Dayton Police Department Detective Greg Vance ("Vance"), who was part of the team conducting surveillance on Flores, established surveillance in the backyard of a residence located at 430 East Bruce Avenue ("430 East Bruce"), also in Dayton.[5] The backyard of 430 East Bruce adjoined the backyard of 3221 Riverside, being separated by a fence with heavy bushes on either side. From a secluded location in the bushes on the 430 East Bruce side of the fence, Vance was able to observe what was happening in the backyard and in the area of the garage at Cole's residence.[6] That officer saw Flores and Cole remove objects from the vehicle the former had been driving and from a Chevrolet Lumina belonging to Cole and take those objects into the garage at Cole's residence.[7] In addition, Vance saw those two disassemble the Ford LTD, by removing everything including the spare tire and carpeting from its trunk, as well as its back seat. Following that process of dismantling, a pink object was placed in the area of the trunk of that vehicle and it was reassembled.

At that point, Flores shook hands with Cole, got into the Ford LTD and drove away. Officers decided to stop Flores, and that task was assigned to Chris Weber ("Weber"), a sergeant in the Dayton Police Department, who was in uniform and driving a marked cruiser. However, Flores merely drove around the block and returned to 3221 Riverside, with Weber following behind. Assuming that he had been observed, Weber decided to stop Flores, who was not able to produce a

driver's license. Nevertheless, Weber merely gave Flores a verbal warning. A short time later, Flores prepared to leave again; however, before he could do so, Vance overheard Cole tell Flores to get into the Chevrolet Lumina. After informing Co-Defendant Ronald Mabe that the two would return in a few minutes (which Vance also overheard), Cole and Flores left in that vehicle. Vance, having heard what Cole had said, warned the other officers that this trip appeared to be a ruse designed to ascertain whether Flores would be stopped again. Accordingly, Cole and Flores were permitted to drive away unmolested, returning to 3221 Riverside approximately three minutes later.

■ Upon returning to that residence, Cole and Flores once again disassembled the trunk area of the Ford LTD, removed the pink object from the area in which it had been secreted less than an hour earlier, and reassembled that vehicle. Cole and Flores then left 3221 Riverside in the Ford LTD, with Cole driving. Shortly thereafter, an individual walked out of that house, got into a Cadillac that was parked in the driveway and started to drive away. Fearing that contraband might be inside, officers prevented that person from leaving in that vehicle. In addition, they conducted a protective sweep of 3221 Riverside and its garage. In the meantime, officers had stopped the Ford LTD, in which Cole and Flores were riding, on Ridge Avenue, a short distance from 3221 Riverside. After securing Flores' consent, the officers conducted a search of the vehicle, which included an inspection by Rusty, a drug detection dog. Although Rusty reacted positively to that vehicle (i.e., indicating that controlled substances were located inside), officers did not discover controlled substances or other evidence therein.

5. On a number of occasions, Vance knocked on the door at 430 East Bruce, in order to identify himself and to explain his presence to any occupants of that residence. Since no one was home, he did not speak to anyone.

6. Vance could not see into the garage.

7. Throughout his surveillance of 3221 Riverside, Vance kept other officers informed about his observations over his radio.

Flores' visit to 3221 Riverside had lasted approximately two hours.

Using the information that officers had developed during their investigation and surveillance, Special Agent Randall Terry ("Terry"), of the Drug Enforcement Administration, executed an affidavit, with which he was able to obtain a search warrant from United States Magistrate Judge Michael Merz. Terry obtained that warrant at approximately 10:30 p.m., on September 10th, and 3221 Riverside was searched thereafter.

It is axiomatic that Fourth Amendment rights are personal and may be asserted only by someone whose rights have been violated. *See e.g., Alderman v. United States,* 394 U.S. 165, 171–72, 174 (1969)("The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." … "We adhere to … the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted"). The Government argues that Flores' Fourth Amendment rights were not violated by the search of 3221 Riverside, since that was Cole's, rather than Flores', residence and, further, because Flores did not have a legitimate expectation of privacy in that residence. Thus, the Court must initially decide whether Flores had a such an expectation of privacy in Cole's residence. *See e.g., Rakas v. Illinois,* 439 U.S. 128 (1978)(only person who had a legitimate expectation of privacy in the place searched can have suffered a violation of the Fourth Amendment as a result of the search). Of course, Flores has the burden of establishing that he had such a reasonable expectation of privacy in 3221 Riverside. *United States v. McRae,* 156 F.3d 708, 711 (6th Cir.1998).

In recent years, the Supreme Court has, on two occasions, addressed the question of whether a visitor, such as Flores, had a legitimate expectation of privacy in his host's residence, so that a search of that residence would violate the visitor's Fourth Amendment rights. In *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), the Supreme Court held that an overnight guest had a legitimate expectation of privacy in such a residence. The *Olson* Court explained the rationale for its holding as follows:

To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations of privacy that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.

From the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy, a place where he and his possessions will not be disturbed by anyone but his host and those his host allows inside. We are at our most vulnerable when we are asleep because we cannot monitor our own safety or the security of our belongings. It is for this reason that, although we may spend all day in public places, when we cannot sleep in our own home we seek out another private place to sleep, whether it be a hotel room, or the home of a friend.

*Id.* at 98–99, 110 S.Ct. 1684.

Subsequently, in *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the Supreme Court held that the defendants, who had not been over-

night guests, did not have a legitimate expectation of privacy in their host's residence. Therein, an individual permitted the defendants to use her apartment to bag cocaine. An officer observed that activity by looking through a gap in a closed blind. On the basis of that observation, law enforcement officials were able to secure a search warrant. The defendants moved to suppress the evidence seized during the subsequent search of that apartment, claiming that the officer had violated the Fourth Amendment as a result of his initial observation of them through the gap in the blind. The trial court overruled the defendants' motion to suppress, concluding that the defendants did not have standing to challenge the search of the apartment, since they had only been in that residence for approximately two and one-half hours, solely for the purpose of furthering their drug distribution activity, and that they did not have a previous relationship with those premises.[8] Thereafter, the defendants were convicted, a conviction which the court of appeals affirmed. Upon further appeal, the Minnesota Supreme Court reversed the conviction, concluding that the defendants had a reasonable expectation of privacy in and, thus, standing to challenge the search of the apartment, since its lessor had invited them to her residence. The United States Supreme Court reversed. Initially, the *Carter* Court stressed that the question of whether a defendant had a legitimate expectation of privacy in a place that has been searched is properly analyzed under substantive Fourth Amendment law, rather than the "rubric" of standing. 525 U.S. 83, 119 S.Ct. at 472. The *Carter* Court reiterated the familiar two-part test that is employed to determine whether an individual is entitled to claim that a particular search violated *his* rights under the Fourth Amendment (as opposed to those of someone else):

in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one which has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

*Id.* (quoting *Rakas v. Illinois*, 439 U.S. 128, 143–44, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Applying that test to the facts before it, the *Carter* Court concluded that the defendants' Fourth Amendment rights had not been violated, because they were in the apartment to conduct a commercial transaction (albeit an illegal one), writing:

If we regard the overnight guest in *Minnesota v. Olson* as typifying those who may claim the protection of the Fourth Amendment in the home of another, and one merely "legitimately on the premises" as typifying those who may not do so, the present case is obviously somewhere in between. But the purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of any previous connection between respondents and the householder, all lead us to conclude that respondents' situation is closer to that of one simply permitted on the premises. We therefore hold that any search which may have occurred did not violate their Fourth Amendment rights.

*Id.* 525 U.S. 83, 119 S.Ct. at 474. Justice Kennedy, while joining the majority opinion, wrote a concurring opinion, in which he stated that he joined the majority opinion, because "its reasoning is consistent with my view that almost all social guests have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home." *Id.* 525

---

8. The defendants had paid for the use of the apartment by giving the tenant of the apart-

ment one-eighth of an ounce of cocaine.

U.S. 83, 119 S.Ct. at 478. In separate opinions, Justices Ginsburg (in dissent) and Breyer concluded that the defendants had a reasonable expectation of privacy in the apartment.[9]

■ Applying that precedent to the evidence presented during the suppression hearing in this criminal prosecution, this Court concludes that Flores did not have a legitimate expectation of privacy in Cole's residence at 3221 Riverside. On the contrary, the evidence established that Flores was nothing more than a business invitee or guest, during his stay of approximately two hours at that address.[10] When Flores arrived at 3221 Riverside, he was greeted by Cole, which indicates that Flores was on the premises with the latter's permission. However, that is not sufficient to establish that Flores had a legitimate expectation of privacy while on those premises. After Flores had arrived, he and Cole moved articles from the vehicle Flores had driven to that location and from the Chevrolet Lumina that belonged to Cole. In addition, on two occasions, they disassembled and reassembled the trunk and back seat of Flores' Ford LTD. While Flores was at 3221 Riverside, he was allowed to enter the garage freely and to store items therein. However, there is no evidence that Flores ever entered Cole's house. Moreover, there is no evidence that Flores engaged in activity that one might normally associate with a social guest. On the contrary, the evidence convinces the Court that Flores visited Cole for the singular purpose of furthering the distribution of controlled substances. When officers searched the garage at 3221 Riverside, they located the two containers that Vance had seen Flores and Cole remove from the Chevrolet Lumina and the Ford LTD. Officers found controlled substances inside those containers. In sum, since Flores was only at 3221 Riverside for a short period of time, approximately two hours, in order to engage in the commercial activity (albeit illegal) of distributing controlled substances, the Court concludes that, like the defendants in *Carter*, he did not have a reasonable expectation of privacy in that location.

This Court's conclusion in that regard is consistent with decisions reached by courts in cases arising out of analogous factual situations, issued after the Supreme Court decided *Carter*.[11] In *United States v. Flores*, 172 F.3d 695 (9th Cir.1999), the Ninth Circuit applied *Carter* and concluded that the defendant did not have a legitimate expectation of privacy in an apartment that had been searched, because he had been there for only a short period of time, in order to conduct a drug transaction. In *United States v. Gordon*, 168 F.3d 1222 (10th Cir.1999), the Tenth Circuit also applied *Carter* to conclude that the defendant did not have a reasonable expectation of privacy in a motel room, which had been rented by another, because he had been there only short period

9. Justices Stevens and Souter joined Justice Ginsburg's dissenting opinion. Justice Breyer concurred in the Court's judgment, since he concluded that the officer had not violated the Fourth Amendment by peering through the gap in the blinds. Justice Ginsburg did not address that issue.

10. Unlike the defendant in *Olson*, Flores was not an overnight guest at Cole's residence.

11. This Court's conclusion that Flores did not have a reasonable expectation of privacy in 3221 Riverside also comports with decisions by the Sixth Circuit which predate *Carter*. For instance, in *United States v. Love*, 1995 WL 675562, 70 F.3d 116 (6th Cir.1995), the Sixth Circuit concluded that the defendant did not have a legitimate expectation of privacy in his mother's house, because he had moved out six months before that residence had been searched and, after moving out, had only been a casual visitor. *See also, United States v. Dix*, 1995 WL 351182, 57 F.3d 1071 (6th Cir.1995) (holding that defendant did not have a legitimate expectation of privacy in his sister's house, even though he was a frequent, but casual visitor); *United States v. Maddox*, 944 F.2d 1223 (6th Cir.), *cert. denied*, 502 U.S. 950, 112 S.Ct. 400, 116 L.Ed.2d 349 (1991) (transient party guest did not have a legitimate expectation of privacy in the place where the party was being held).

of time in order to engage in the trafficking of controlled substances. The *Gordon* court concluded that the defendant was more similar to someone merely on the premises, who does not have a legitimate expectation of privacy, rather than to an overnight guest, who has such an expectation. *Id.* at 1227.

Nevertheless, Flores places significant reliance upon Justice Kennedy's concurring opinion in *Carter,* which, according to Flores, indicates that five present members of the Supreme Court would hold that a social guest has a legitimate expectation of privacy in his host's residence. Assuming for present purposes that the opinions of Justices Kennedy, Breyer and Ginsburg (the last of which was joined by Justices Stevens and Souter), read together, establish the rule that a social guest has such an expectation of privacy, this Court has found, for the reasons set forth above, that Flores visited 3221 Riverside, in order to further his business of distributing controlled substances, rather than as a social guest.

In addition, the cases which Flores has cited are distinguishable. For instance, in *Bonner v. Anderson,* 81 F.3d 472 (4th Cir. 1996), the plaintiff brought an action under 42 U.S.C. § 1983, to recover damages she had allegedly suffered when officers broke into her neighbor's house to execute a search warrant therein. The plaintiff was in that house when those events occurred. The Fourth Circuit concluded that the plaintiff had a legitimate expectation of privacy in her neighbor's house, because she visited there often, her half-sister had been raised there and she had previously resided in a neighboring building on the same property. In addition, the plaintiff was present, at the time the search warrant was executed, to run an errand for the elderly woman who resided in the house in question, a task which she fre-

quently performed. Simply stated, the evidence presented in this case is not close to that presented in *Bonner.* For instance, there was no testimony that Flores had ever been to Cole's residence before September 10th, let alone that he had been there frequently.[12] Flores went to Cole's residence solely in order to engage in a commercial activity (the distribution of controlled substances), rather than to run errands for an elderly neighbor. In addition, Flores cites *United States v. Chandler,* 18 F.Supp.2d 1240 (D.Kan.1998), wherein the District Court concluded that the Defendant had a legitimate expectation of privacy in two residences that had been searched, because, when the warrants were executed, he was in the process of moving from one residence to the other. Under the facts presented to the Court at the motion hearing, Flores was not in the process of moving into or out of 3221 Riverside.

Since the Court has concluded that Flores did not have a legitimate expectation of privacy in 3221 Riverside, it is not necessary to address the issue of whether the search of those premises violated the Fourth Amendment. In particular, this Court need not grapple with the issue of whether the search warrant for 3221 Riverside was invalid, because Terry's affidavit, with which that warrant was obtained, contained information concerning the seizure of 7,200 pounds of marijuana from Flores in 1987, evidence which had been suppressed in his subsequent prosecution arising out of that seizure.

Accordingly, based upon the foregoing, the Court overrules Flores' Amended Motion to Suppress Evidence (Doc. # 94), to the extent that, with that motion, Flores requests that the Court suppress the evidence seized from 3221 Riverside, when a

---

12. Flores notes that there is evidence that he had met with Cole, prior to visiting him at his residence on September 10, 1997. While Flores correctly recounts the evidence (for instance, Warren testified that he had ob-

served Flores and Cole together at the Quality Inn on August 26, 1997), there was no evidence that Flores had been to Cole's residence before September 10th.

search warrant was executed on the premises on September 10, 1997.