**UNITED STATES of America,
Plaintiff,**

v.

**Michael Kevin HANSEN, Defendant.**

**No. 1:03CR00080W.**

United States District Court,
D. Utah,
Northern Division.

Oct. 6, 2004.

Colleen K. Coebergh, Salt Lake City, UT, for Plaintiff.

H. Don Sharp, Ogden, UT, for Defendant.

## MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

WINDER, Senior District Judge.

This matter is before the court on Defendant's Motion to Suppress. On May 24, 2004, the court conducted an evidentiary hearing on the motion. Defendant Michael Kevin Hansen ("Hansen") was present with his counsel, H. Don Sharp. The government was represented by Colleen K. Coebergh. Following the hearing, the court ordered a transcript as well as supplemental briefing from the parties. After thorough review and consideration of the pleadings submitted by the parties and the testimony presented at the evidentiary hearing on the motion to suppress, the court enters the following memorandum decision and order.

### BACKGROUND

The court finds the relevant facts as follows.[1] Agent Robert Thompson is employed by the Davis County Sheriff's Department and is assigned to the Davis Metro Narcotics Strike Force. (Tr. at 17.) In that capacity, Agent Thompson investigates drug trafficking offenses and crimes related to drugs. (Tr. at 17.) The investigation in this case did not begin as an investigation of the defendant, Hansen, but rather was focused on an individual named Billy Beaver. Agent Thompson was the case agent responsible for investigating Mr. Beaver. (Tr. at 18.) As part of an undercover operation, Agent Thompson, Agent Jeffries, and Agent Edwards had been purchasing methamphetamine from

---

1. Reference to the transcript of the evidentiary hearing conducted on May 24, 2004, will be cited as "Tr. at ___."

Mr. Beaver. (Tr. at 18.) The agents learned about the defendant, Hansen, during the following exchange with Mr. Beaver. (Tr. at 18–19.)

On April 29, 2003, Agent Jeffries arranged to purchase methamphetamine from Mr. Beaver. When Agent Jeffries met with Mr. Beaver to make the purchase, Mr. Beaver wanted Agent Jeffries to "front" the money and then wait while Mr. Beaver went to retrieve the methamphetamine. (Tr. at 19.) Agent Jeffries refused, fearing his money would be stolen. (Tr. at 19.) Attempting to work out an "alternate deal," Mr. Beaver made a telephone call to his friend. During the course of the telephone conversation Mr. Beaver referred to his friend as "Mike." (Tr. at 19.) The agents were able to hear Mr. Beaver's telephone conversation via an undercover listening device. (Tr. at 19.) During the telephone conversation, "Mike" indicated that he was in possession of some methamphetamine and was on his way to the Holly Haven apartments. "Mike" told Mr. Beaver that he would meet him at the Holly Haven apartments in about an hour. (Tr. at 20.) Agent Jeffries told Mr. Beaver to "call him when the dope arrived." (Tr. at 20.)

Later, Mr. Beaver called Agent Jeffries, instructing him to meet in the Clearfield High School parking lot. As planned, Mr. Beaver and Agent Jeffries met in the parking lot and waited until a white Honda passed their location. (Tr. at 21.) Mr. Beaver pointed out the white Honda and said, "that's Mike." Mr. Beaver told Agent Jeffries to follow the Honda to the apartment complex, and to look for apartment # 36. (Tr. at 21, 22, 58.) After arriving at the Holly Haven apartments, Mr. Beaver went into an apartment within the complex and then returned with the methamphetamine necessary to complete the transaction. (Tr. at 22.) None of the agents approached Holly Haven apartment # 36 on that date. During the course of this transaction, in an attempt to figure out who "Mike" might be, agents obtained the license plate number from the white Honda. It showed that the vehicle was registered to Mike Hansen out of Brigham City. (Tr. at 26, 52.)

Thereafter, on May 5, 2003, Mr. Beaver contacted Agent Jeffries and Agent Edwards. Agent Jeffries arranged to purchase four ounces of methamphetamine from Mr. Beaver, and Agent Edwards arranged to purchase eight ounces of methamphetamine from Mr. Beaver. (Tr. at 23, 58.) The agents arranged to have all of the methamphetamine delivered at the same time and location, but in two separate purchases. (Tr. at 23.) In other words, the transaction was to occur in increments rather than all at once. (Tr. at 25.) Mr. Beaver told the agents to meet him at the Holly Haven apartments where they had done the prior deal. (Tr. at 25, 58.)

The agents arrived at the designated location at approximately 10:30 p.m. Given the amount of methamphetamine that was being purchased, and given the progression of the investigation, the agents had determined that they would arrest the individuals involved in the drug transaction at the scene "as soon as the deal had gone down." (Tr. at 24.) Metro Strike Force agents created a plan of operation and placed agents in various locations throughout the apartment complex to conduct surveillance. (Tr. at 27.)

When Mr. Beaver arrived at the Holly Haven apartments, he approached Agent Jeffries and Agent Edwards in the parking area. (Tr. at 24.) Mr. Beaver told the agents that Mike was on his way. (Tr. at 24.) Mr. Beaver told the agents that he was going to wait inside the apartment and as soon as Mike arrived, "he would bring

out the first part of the dope." (Tr. at 24–15.)

Metro Strike Force agents who were observing the apartment complex watched Mr. Beaver enter apartment # 36. (Tr. at 78.) Several minutes later, agents observed a Chevy truck arrive at the apartments. A male and female exited the truck and entered apartment # 36. (Tr. at 25.)

A short time later, Mr. Beaver exited apartment # 36 and made contact with Agent Jeffries and Agent Edwards in the parking area. Mr. Beaver delivered approximately four ounces of methamphetamine to Agent Jeffries. At that point, the agents "gave the signal" that the drug transaction was taking place. Mr. Beaver was arrested outside the apartment, in the parking area. (Tr. at 27.)

At the time of Mr. Beaver's arrest, the agents that were conducting surveillance on apartment # 36 confirmed that the male and female who had entered the apartment remained inside. (Tr. at 27.) However, the agents also noticed that there were two individuals, located on balconies within the complex, who were watching Mr. Beaver's arrest. The agents noticed that when Mr. Beaver was arrested, both individuals immediately "got on" their phones. (Tr. at 27.) The agents did not know whether these individuals were involved in the drug operation. (Tr. at 28.) Agent Thompson testified that this behavior caused him concern, and particular concern for officer safety. (Tr. at 28, 72.) Officer Thompson testified that he was concerned that these individuals might be calling inside apartment 36 to warn the occupants that the drug transaction was a police operation and that people were being arrested. (Tr. at 28.) Officer Thompson feared "some sort of barricade situation," where suspects can arm themselves. (Tr. at 28.) In addition, Officer Thompson

feared that the evidence—the remaining eight ounces of methamphetamine—would be destroyed. (Tr. at 28–29.)

At that point, Agent Thompson, along with three additional officers, approached apartment # 36. (Tr. at 29.) Agent Thompson testified that his purpose in going to apartment # 36 was "to freeze the apartment and secure the evidence and then leave that and go and get a search warrant." (Tr. at 65.) Agent Thompson and Agent Taylor went to the front door. The two additional officers covered a sliding glass door on the patio to prevent anyone from escaping. (Tr. at 30, 65.) Agent Thompson knocked on the door of apartment # 36 and a woman, later identified as Julie Folker, answered. (Tr. at 30, 83.) The agents displayed their badges and indicated that they were police officers. (Tr. at 31, 84.) The agents did not have their weapons drawn. (Tr. at 32.)

The agents were cut short from explaining the reason for their visit because as soon as they indicated they were "police," they could hear "a bunch of commotion" within the apartment. (Tr. at 31.) Additionally, the agents heard what sounded like a plastic bag being "hurriedly crumpled." (Tr. at 31, 85.) Given the surveillance reports, the agents were aware that in addition to Ms. Folker, there were at least two other occupants in the apartment, and the noise coming from inside the apartment confirmed there were others inside. (Tr. at 31, 82.) The agents were unable to see the other occupants which caused them concern. (Tr. at 31.) Agent Thompson testified: "If you can't see somebody you don't know what their actions are, what's taking place. It's a very dangerous situation for a police officer." (Tr. at 31.)

Given the commotion and activity inside the apartment, and the fact that the officers were unable to account for all of the

occupants, Agent Thompson and Agent Taylor entered the apartment. The agents unholstered their weapons and held them at a "low ready position" for "officer safety purposes." (Tr. at 32, 85.)

The agents described the apartment as very small, with a dividing wall between the front room and the kitchen. (Tr. at 66.) Agent Taylor entered first and went around the dividing wall toward the kitchen, in the direction of the noise or commotion. (Tr. at 31.) As Agent Taylor came around the dividing wall, he observed a man, sitting at a table, bent over with a plastic bag in his hands, on the floor. (Tr. at 85–87.) The man, later identified as Hansen, began to sit up. Agent Taylor immediately told Hansen to get on the floor and "let me see your hands." Hansen complied. (Tr. at 87.) Agent Taylor testified that when he saw Hansen bent over and holding a bag, he was concerned that Hansen might have a weapon. (Tr. at 88.) Once Hansen was on the floor, given the close proximity of Agent Taylor, Hansen, and the plastic bag, Agent Taylor was readily able to view the contents of the plastic bag. (Tr. at 87.) Agent Taylor said the contents of the plastic bag were in "plain view," but the bag was not searched at that time. (Tr. at 87.)

Agent Thompson entered the apartment second and remained in the front room where, in addition to Ms. Folker, he observed a woman sitting on a couch. (Tr. at 31–32.) Agent Thompson instructed everyone to lie down on the floor. (Tr. at 32.) The woman from the couch, later identified as Misty Hansen, and Ms. Folker got down on the floor. Although Agent Thompson had seen only the two women upon entering the apartment, after instructing the occupants to lie on the floor, Hansen, who had been sitting at the kitchen table, came into view. (Tr. at 33.) Agent Thompson then asked who lived there. Ms. Folker indicated the apartment was hers. (Tr. at 33.) Agent Thompson asked the male occupant if his name was Mike Hansen and he responded, "yes." (Tr. at 33.) Agent Thompson testified that the officers who initially entered the apartment "were not searching for any evidence. Our purpose was to freeze the apartment, to make sure the evidence could not be destroyed." (Tr. at 71.)

At that time, Hansen and Misty Hansen were handcuffed. The two additional officers that had approached the sliding door of the apartment now entered and held custody of Hansen and Misty Hansen while Agent Thompson directed his attention to Ms. Folker. (Tr. at 34.) Agent Thompson instructed Ms. Folker to get up from the floor and asked to speak with her. Agent Thompson introduced himself and explained to Ms. Folker that he was investigating methamphetamine trafficking that was coming from her apartment. (Tr. at 34–35.) Agent Thompson explained that he believed there were still eight ounces of methamphetamine inside the apartment. Ms. Folker stated that she did not believe there was methamphetamine in her apartment and then voluntarily stated: "Go ahead and search my house." (Tr. at 35.) Agent Thompson testified that he told Ms. Folker, "No, wait a minute . . . let me explain some things first." Agent Thompson testified that he then informed Ms. Folker that he did not have a warrant, but that he would attempt to secure one through the county attorney. He also explained that she had a right to privacy and did not have to allow the officers to search her home, but explained further that if she wanted to cooperate, the officers could search her home with her cooperation. (Tr. at 35–36.) Ms. Folker testified that the officers who spoke with her were courteous. (Tr. at 98.) Ms. Folker indicated that she understood what Agent Thompson

was saying and she agreed to let the officers search the apartment. (Tr. at 36, 98.)

After obtaining Ms. Folker's consent, Agent Taylor went back into the apartment and recovered the bag that Hansen had been holding when the agents entered the apartment. Within the bag, Agent Taylor found what appeared to be eight ounces of methamphetamine. (Tr. at 36.)

Ms. Folker testified that prior to May 5, 2003, Hansen had been in her apartment "maybe once before," and that he had stayed for only a few minutes. (Tr. at 9, 11.) Ms. Folker further testified that on the day in question, Hansen called her and asked if he could come over because he wanted to meet a friend at her apartment. (Tr. at 9.) Ms. Folker testified that Hansen had never been an overnight guest and was not intending to be an overnight guest on that occasion. (Tr. at 12.) According to Ms. Folker, Hansen had been in her apartment for approximately five minutes prior to the police entry. (Tr. at 12.)

## DISCUSSION

### I. Standing

Although the question of whether a search and seizure violates the Fourth Amendment rights of a particular defendant is often referred to as "standing," "it is 'more properly subsumed under Fourth Amendment doctrine.'" *United States v. Abreu*, 935 F.2d 1130, 1132 (10th Cir.) (quoting *Rakas v. Illinois*, 439 U.S. 128, 139, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)), *cert. denied*, 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991). The analysis focuses on whether the challenged search or seizure "violated the Fourth Amendment rights of [the] criminal defendant who seeks to exclude the evidence . . . ." *Rakas*, 439 U.S. at 140, 99 S.Ct. 421. "It is immaterial if evidence sought to be introduced against a defendant was obtained in viola-

tion of someone else's· fourth amendment rights. Fourth amendment rights are personal and cannot be asserted vicariously." *United States v. Arango*, 912 F.2d 441, 445 (10th Cir.1990), *cert. denied*, 499 U.S. 924, 111 S.Ct. 1318, 113 L.Ed.2d 251 (1991).

To ascertain whether a search has violated the rights of a particular defendant who seeks to exclude the resulting evidence, the court must decide whether the defendant had an "expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). "An expectation of privacy is reasonable if it arises from a source 'outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *United States v. Gordon*, 168 F.3d 1222, 1225–26 (10th Cir.) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143–44, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)), *cert. denied*, 527 U.S. 1030, 119 S.Ct. 2384, 144 L.Ed.2d 786 (1999).

In other words, in order to challenge the government's use of evidence found in Ms. Folker's apartment on Fourth Amendment grounds, Hansen must demonstrate that he personally had an expectation of privacy in Ms. Folker's apartment, and that his expectation was reasonable. *See Carter*, 525 U.S. at 88, 119 S.Ct. 469 (citing *Rakas v. Illinois*, 439 U.S. 128, 143–44 & n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). The burden is on defendant to show that he had such an expectation. *Gordon*, 168 F.3d at 1226; *United States v. Conway*, 73 F.3d 975, 979 (10th Cir.1995).

In the case before the court, the premises that were searched belonged to Ms. Folker. Mr. Hansen telephoned Ms. Folker and asked her for permission to use her apartment as a place where he could "meet a friend." Ms. Folker consented to

his request. Hansen had been in Ms. Folker's apartment on one occasion prior to this, and the prior visit had been very brief. Mr. Hansen had never been an overnight guest at Ms. Folker's, and he did not intend to be one on the date in question. While at Ms. Folker's apartment, Hansen used the premises to engage in a drug transaction. Hansen had been at Ms. Folker's apartment for a brief period of time prior to the arrival of the officers—approximately five minutes. Hansen contends he had a legitimate expectation of privacy in Ms. Folker's apartment because he was a guest and on the premises with Ms. Folker's permission.

In *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the Supreme Court held that defendants who were in another person's apartment for a short time solely for the purpose of packaging cocaine had no legitimate expectation of privacy in the apartment and, thus, any search which may have occurred did not violate their Fourth Amendment rights. 525 U.S. at 90–91, 119 S.Ct. 469. The Court distinguished between the legitimate privacy expectations of overnight guests and the mere permission to be on the premises give to those "essentially present for a business transaction and [ ] only in the home for a matter of hours." *Id.* at 90, 119 S.Ct. 469. The Court concluded that the visit was primarily commercial and not social, noting the lack of a prior relationship between the defendants and the lessee of the apartment, the brevity of the visit, and the fact that the defendants were simply using the apartment for business purposes. *Id.* The Court explained that an individual's expectation of privacy in commercial premises "is less than a similar expectation in an individual's home." *Id.* As the Supreme Court put it, although the apartment was a dwelling place, for the defendants it was "simply a place to do business." *Id.; see also Gor-*

*don,* 168 F.3d at 1226 (characterizing the Supreme Court's opinion in *Carter* as "heighten[ing] the burden for a defendant claiming a reasonable expectation of privacy in a dwelling other than his own home, when the defendant's presence in the dwelling is for a commercial or business purpose").

In *United States v. Gordon,* 168 F.3d 1222 (10th Cir.), *cert. denied,* 527 U.S. 1030, 119 S.Ct. 2384, 144 L.Ed.2d 786 (1999), the Tenth Circuit, applying the principles set forth in *Carter,* similarly concluded that a defendant lacked a reasonable expectation of privacy in a motel room that was leased to another person. As in *Carter,* the defendant in *Gordon* was present at the motel for a business purpose, i.e., distributing drugs. Although the defendant possessed a key to the motel room and men's clothing and toiletries were found in the room, nothing in the record established that those items belonged to the defendant. In addition, the court found it significant that the defendant was only present briefly in the motel room, determining that "[a]t most, he was present in the room for a couple of hours." *Id.* at 1227.

The facts of the case presently before the court are similar to *Carter* and *Gordon.* The defendant, Hansen, was present in an apartment leased to another person, for a short time (approximately five minutes), for the purpose of conducting business. As in both *Carter* and *Gordon,* the defendant's status was more like one "simply permitted on the premises" instead of that of an "overnight guest." *Carter,* 525 U.S. at 90, 119 S.Ct. 469; *Gordon,* 168 F.3d at 1227. The Supreme Court found no reasonable expectation of privacy in *Carter,* and the Tenth Circuit found no reasonable expectation of privacy in *Gordon.* Likewise, the court finds no reasonable expectation of privacy here. Hansen

presented no evidence at the suppression hearing tending to show that his visit to Ms. Folker's apartment, which lasted approximately five minutes, was anything other than commercial in nature. Simply stated, Hansen failed to meet his burden of showing that he had a legitimate expectation of privacy in Ms. Folker's apartment.[2] Because Hansen did not have a reasonable expectation of privacy in Ms. Folker's apartment, he lacks a basis to challenge the search.

Moreover, even if the court were to have found that defendant had a reasonable expectation of privacy in the apartment, it would nonetheless deny defendant's motion to suppress. Based on the evidence before the court, the initial entry into Ms. Folker's apartment would have been justified given the agents' legitimate concerns regarding the destruction of evidence and officer safety.

 As the agents approached Ms. Folker's apartment, they knew that there were at least three occupants inside as well as eight additional ounces of methamphetamine. Both agents testified that, given the cell phone calls made by unknown individuals who watched Mr. Beaver's arrest combined with the commotion which occurred when they introduced themselves as "police" at Ms. Folker's door, they were concerned about the destruction of the evidence that was inside. " 'When officers have reason to believe that criminal evidence may be destroyed, ... or removed, ... before a warrant can be obtained, the circumstances are considered sufficiently critical to permit officers to enter a private residence in order to secure the evidence while a warrant is sought.' " *United States v. Carter*, 360 F.3d 1235, 1241 (10th Cir.2004) (quoting *United States v. Cuaron*, 700 F.2d 582, 586 (10th Cir.1983)). There are "four requirements for a permissible warrantless entry when the police fear the imminent destruction of evidence." *United States v. Scroger*, 98 F.3d 1256, 1259 (10th Cir. 1997). Such an entry must be "(1) pursuant to clear evidence of probable cause, (2)

---

2. The court's conclusion is consistent with decisions reached by courts in cases arising out of analogous factual situations, issued after the Supreme Court's decision in *Carter*. *See United States v. Gordon*, 168 F.3d 1222 (10th Cir.), *cert. denied*, 527 U.S. 1030, 119 S.Ct. 2384, 144 L.Ed.2d 786 (1999); *see also, United States v. Harris*, 255 F.3d 288, 294–95 (6th Cir.) (providing that although overnight guest may possess a legitimate expectation of privacy in a residence being searched, a temporary visitor to a residence may claim no such protection, particularly when the person was on the premises for the sole purpose of a drug-related business transaction), *cert. denied sub. nom Taylor v. United States*, 534 U.S. 966, 122 S.Ct. 378, 151 L.Ed.2d 288 (2001); *United States v. Sturgis*, 238 F.3d 956, 959 (8th Cir.) (providing that defendant, who was visiting another's motel room for purely commercial purpose of distributing controlled substances, lacked a reasonable expectation of privacy in motel room), *cert. denied*, 534 U.S. 880, 122 S.Ct. 182, 151 L.Ed.2d 127 (2001); *United States v. Vega*, 221 F.3d 789, 798 (5th Cir.2000) (providing that defendant failed to show a reasonable expectation of privacy in residence rented by a codefendant where defendant presented no evidence that his visit to the residence was anything other than commercial in nature and defendant had no other ties to codefendant), *cert. denied*, 531 U.S. 1155, 121 S.Ct. 1105, 148 L.Ed.2d 975 (2001); *United States v. Flores*, 172 F.3d 695, 699 (9th Cir.) (where defendant was only present in the apartment to conduct a brief drug transaction, the fact that the resident of the apartment consented to its use by a third person to deliver drugs to defendant did not provide defendant with a legitimate expectation of privacy in the apartment on the theory he was an invited guest), *cert. denied*, 528 U.S. 886, 120 S.Ct. 204, 145 L.Ed.2d 172 (1999); *United States v. Flores*, 85 F.Supp.2d 785 (S.D.Ohio 1999) (concluding that visitor who was at residence for approximately two hours for purpose of furthering distribution of controlled substances did not have legitimate expectation of privacy in residence; visitor was a business invitee or guest, not a social guest).

available only for serious crimes and in circumstances where the destruction of evidence is likely, (3) limited in scope to the minimum intrusion necessary, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse." *Id.* (quoting *United States v. Aquino,* 836 F.2d 1268, 1272 (10th Cir.1988)). The evidence in this case supports each of these factors, justifying the limited intrusion.

Moreover, there was evidence to support the agents' belief that the situation posed a threat to officer safety. The Tenth Circuit has provided that a limited sweep to ensure police officers' safety is permissible if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others. *See United States v. Carter,* 360 F.3d 1235, 1242 (10th Cir.2004).

■ Thereafter, the actual search of Ms. Folker's apartment was justified pursuant to Ms. Folker's voluntary consent. One of the specifically established exceptions to both the warrant and probable cause requirement is a search conducted pursuant to consent. *Davis v. United States,* 328 U.S. 582, 593–94, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946). A search pursuant to consent "is a constitutionally permissible and wholly legitimate aspect of effective police activity." *Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *see Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *see also United States v. Abdenbi,* 361 F.3d 1282, 1287–88 (10th Cir.2004) (providing that the Fourth Amendment's general prohibition against warrantless entry does not apply to situations in which voluntary consent has been obtained from the individual whose property is searched).

Therefore, based on the foregoing and good cause appearing, IT IS HEREBY ORDERED that defendant's motion to suppress is DENIED.