Filed 2/26/13  P. v. Cathey CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TYWANA MARIE CATHEY et al.,<br><br>    Defendants and Appellants. | C065248<br><br>(Super. Ct. No. 07F00933) |

Defendants, Tywana Marie Cathey (Cathey) and Christopher Mason, Jr. (Mason), while formerly married, remained linked in an on-going drug trafficking operation for which they were arrested, charged, and tried by jury.

Mason was convicted of possession of cocaine base for sale (Health & Saf. Code, § 11351.5; count one), possession of a firearm by a convicted felon (Pen. Code, former § 12021, subd. (a)(1), now § 29800, subd. (a)(1); count three),[1] and possession of ammunition while prohibited from owning or possessing a firearm (former § 12316,

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

1

subd. (b)(1), now § 30305, subd. (a)(1); count four). He was further found personally armed with a firearm in the commission of count one. (§ 12022, subd. (c).) A count of cultivation of marijuana ended in deadlock. (Health & Saf. Code, § 11358; count two).

Cathey was convicted on counts one and two and found to be personally armed with a firearm in the commission of count one.

In a bifurcated proceeding, the jury found that Mason had six prior serious felony convictions (§§ 667, subds. (b)-(i), 1170.12) and two prior narcotics convictions (Health & Saf. Code, § 11370.2, subd. (a)), and that he had served two prior prison terms (§ 667.5, subd. (b)).

Mason was sentenced to state prison for a determinate term of 11 years plus a consecutive indeterminate term of 25 years to life.[2] The mistried count two was dismissed in the interest of justice in light of the sentence.

Cathey was sentenced to state prison for nine years eight months. Execution of sentence was suspended and Cathey was placed on probation for five years on conditions including 365 days' incarceration.[3]

On appeal, Mason contends the trial court erred when it denied his motion to traverse the search warrant pursuant to *Franks v. Delaware* (1978) 438 U.S. 154 [57 L.Ed.2d 667, 678] (*Franks*). Cathey contends her trial counsel rendered ineffective

---

[2] Mason was awarded 1194 days' custody credit and 596 days' conduct credit. The relevant 2010 amendment to section 2933 does not entitle Mason to additional conduct credit because he has prior convictions for serious felonies. (Former § 2933, subd. (e)(3) [as amended by Stats. 2010, ch. 426, § 1, eff. Sept. 28, 2010].)

[3] The probation report indicates that Cathey is entitled to 59 days' custody credit and is silent as to conduct credit. The recommendation was to suspend execution of sentence conditioned on service of "a maximum period of incarceration as to Count 2." This appears to be an inartfully phrased waiver of conduct credit as a means of maximizing that incarceration. The relevant 2010 amendment to section 2933 does not override the waiver or entitle Cathey to additional credit.

assistance when he expressly declined to join in Mason's *Franks* motion. We conclude the *Franks* motion lacked merit, and Cathey's trial counsel's refusal to join the meritless motion could not have been prejudicial, and therefore affirm.

FACTS

*Prosecution Case-in-Chief*

On January 30, 2007, several teams of law enforcement officers served a search warrant at residences on Delta Street (Delta) and Rio Linda Boulevard (Rio Linda) in Sacramento. The warrant authorized the searches of both residences, a gold Cadillac Escalade, and defendants Cathey and Mason.

*Delta*

Upon entering Delta, officers found and detained both defendants and three other persons. In the kitchen, officers found and seized a glass plate containing 4.02 grams of cocaine base and a razor blade; a baggie containing 6.87 grams of cocaine base; a glass pipe for smoking narcotics; a digital gram scale; a spoon with cocaine residue; six walkie-talkies; and a box of shotgun shells. Mason's fingerprints were found on the glass plate and the digital scale.

In the front room, officers found and seized three surveillance cameras and DVD's explaining how to grow marijuana.

In the southeast bedroom, officers found and seized 0.43 grams of cocaine; 0.74 grams of marijuana; and two boxes of shotgun shells. Officers also found documents and papers belonging to, or relating to, Cathey and Mason. Pacific Gas and Electric bill was addressed to Cathey at Delta.

In the northeast bedroom, officers found and seized a semiautomatic pistol loaded with six rounds. In this bedroom, too, officers found documents related to Cathey and Mason.

In a bathroom, officers found and seized a pipe for smoking narcotics.

3

In the Escalade parked at Delta, officers found cash; documents related to Cathey and Mason; and a stun gun.

A search of Mason's person yielded cash and a key ring with two keys. One key operated the front door lock at Delta, and the other unlocked a safe found at Rio Linda. After Mason was placed in a patrol car, an officer observed he appeared to have several small white objects in his mouth. When the officer tried to reach in Mason's mouth, the objects were gone. In the officer's experience, it is common for people who possess cocaine base to conceal it in their mouths. Cocaine base is not water soluble and cannot be ingested by swallowing it.

Diane Cutrer was present at Delta when the search warrant was executed. She consented to a search of her person. An officer found 0.09 grams of cocaine in her pocket. Cutrer told the officer that she had come to Delta to purchase cocaine. Cutrer testified at trial that she had purchased cocaine from Mason and Cathey on several prior occasions. On the day of the search, she had come to Delta and found cocaine on the kitchen table waiting for her. Mason and Cathey were at the table. Cutrer paid $7 for the cocaine.

*Rio Linda*

Meanwhile, other officers searched Rio Linda, which was four miles away from Delta. Three juveniles were present at Rio Linda; two of them had the last name Mason.

In a bedroom, officers found a safe containing a large plastic baggie. Inside the baggie were three smaller baggies containing cocaine base in the amounts of 27.3 grams, 27.4 grams, and 27.1 grams. The safe also contained $178 cash. In the same bedroom, officers found documents and papers belonging to, or relating to, Cathey and Mason. Some items were addressed to Delta or to a different address in Sacramento County; a child's report card was the only item addressed to Mason at Rio Linda. In the bedroom and bathroom, officers found numerous plastic baggies, some with the corners ripped off.

4

In a different bedroom, officers found 31 immature marijuana plants and a grow light.

*Other Evidence*

Detective Jason Oliver, an expert in the sale and possession of narcotics, testified it was common for sellers of narcotics to keep their supply in one location and conduct sales at a different location. Detective Oliver opined -- based upon the amounts of cocaine base found at the two locations; the presence of packaging material; the presence of equipment such as the digital scale, the razor blade, the safe, walkie-talkies, and the surveillance cameras; and the presence of firearms -- that the cocaine base was possessed for the purpose of sales.

The parties stipulated, for purposes of counts three and four, that Mason was previously convicted of a felony.

*Defense*

Mason presented the testimony of Rosio Gutierrez, who lived next door to Rio Linda. Gutierrez testified Cathey was her neighbor, but that she did not know Mason.

Cathey rested without presenting evidence or testimony.

DISCUSSION

I

Mason contends the trial court violated his Fourth and Fourteenth Amendment rights by denying his motion to traverse the search warrant pursuant to *Franks*. We are not persuaded.

*Background*

A defendant may challenge a search warrant after the warrant has been issued and executed by showing the supporting affidavit contained deliberate falsehoods or statements made with reckless disregard for the truth (*Franks*, *supra*, 438 U.S. at p. 171), or that "the affiant deliberately or recklessly omitted material facts that negate probable

5

cause when added to the affidavit [citations]" (*People v. Eubanks* (2011) 53 Cal.4th 110, 136).

In January 2007, Detective Oliver executed an affidavit in support of a warrant to search Delta and Rio Linda. In the affidavit, Detective Oliver described the investigation that had been ongoing since November 2006.

In the following summary of the affidavit, the statements Mason alleges to be deliberate falsehoods appear in bold font. The facts Mason alleges to have been recklessly omitted appear in bold italic font.

Between November 19, 2006, and December 2, 2006, two confidential informants (CI#1 and CI#2), on different occasions, told law enforcement that an African-American male known to them as "Tattoo" was dealing cocaine base out of Delta. Both informants reported that Tattoo drove a gold Cadillac Escalade and parked it in front of Delta. CI#2 reported that Tattoo had multiple ounces of cocaine base at the residence. Between November 30, 2006, and December 6, 2006, officers observed a third confidential informant (CI#3) walk from Delta to a vehicle that was parked in front. The officers contacted CI#3 about a Vehicle Code violation, searched him, and found cocaine on his person. CI#3 stated that he had just purchased the cocaine from an African-American man inside Delta. CI#3 reported that this man had four ounces of cocaine at Delta and was converting it to cocaine base. CI#3 said the man drove the Escalade that was then parked south of Delta.

On December 1, 2006, two officers saw the Escalade leave Delta. The officers made a traffic stop of the Escalade for a Vehicle Code violation. Cathey was the driver, and Mason was the passenger. A records check showed that Mason had been discharged from parole in May 2006, and that his last parole address was Delta. The Escalade was registered to Cathey or Dorothy Redman. Further checking revealed that the Sacramento Municipal Utility District (SMUD) listed Cathey's address as Delta.

6

On December 11, 2006, detectives conducted surveillance at Delta. At 2:55 p.m., a gold Escalade arrived at the residence and then left within five minutes. The driver matched Cathey's description and the passenger matched Mason's description.

Detectives followed the Escalade to the area of El Camino and Howe, where a white man met with the occupants. The Escalade then proceeded to Rio Linda. **"The occupants of the [Escalade] entered the front door without knocking or waiting to be let in."**

Around 6:09 p.m., detectives saw the Escalade leave Rio Linda. The driver matched Mason's description, and the other occupant was an unidentified teenager. Detectives followed the Escalade and saw the driver stop in a parking lot for a two-minute meeting with the driver of another car. Detective Oliver noted that such a short meeting in a parking lot was consistent with a drug transaction.

The Escalade then proceeded at high speed, at times approaching 95 miles per hour, to San Lorenzo, California, an approximately two-hour trip. The Escalade stopped at a San Lorenzo residence where a person entered the car on the passenger side. Within five minutes the Escalade left the residence, entered a freeway, traveled an unspecified distance, left the freeway, and returned to where it had picked up the passenger.

Within 30 minutes thereafter, the Escalade proceeded back to Sacramento at speeds not exceeding 75 miles per hour and parked at Rio Linda. **"The occupants of the Cadillac entered [Rio Linda] through the front door without knocking or waiting to be let in."** The detectives ended the surveillance. Detective Oliver noted that this trip was consistent with a trip to pick up narcotics from a supplier.

The next morning, Detective Oliver returned to Rio Linda and saw the Escalade was parked where officers had last observed it. Detective Oliver learned the SMUD account for Rio Linda was in the name of Chianti Mason.

On January 3, 2007, detectives conducted additional surveillance. Around 7:30 p.m., they saw Cathey drive the Escalade from Rio Linda to Delta with a male African-

7

American passenger. Within five minutes, the Escalade began to leave. A person approached the passenger side of the Escalade and made a hand-to-hand transaction with the passenger. A surveilling detective believed the activity was consistent with a narcotics transaction. Cathey made several stops in the Escalade before returning to Rio Linda. **"Cathey entered the front door without knocking or waiting to be let in."**

While conducting surveillance on January 16, 2007, around 5:30 p.m., Detective Oliver saw the Escalade arrive at Rio Linda. He saw Mason "exit the passenger side of the vehicle and **enter the front doorway of [Rio Linda] without knocking or waiting to be let in."**

Detective Oliver and another detective (Detective Nasca) then planned an operation in which a confidential reliable informant (CRI) would attempt to buy drugs at Delta. The CRI was shown a color photograph of Mason. "CRI was furnished with pre-recorded official funds with which to purchase drugs/narcotics. **From this point on, the CRI was kept under constant surveillance by [Detective] Nasca or other officers.**" The CRI was followed to the area of Delta and kept under surveillance until he or she approached Delta. A short time later, the CRI left Delta and met officers at a predetermined meeting place. The CRI gave officers a substance that tested positive for cocaine. The CRI confirmed that he or she had used funds provided by the officers to purchase cocaine from Mason inside Delta. *Although the affidavit fails to so state, no surveillance team member visually observed the CRI entering or exiting from Delta.*

Detective Oliver stated his beliefs that Mason was involved in narcotics sales at Delta, resided at Rio Linda, and probably stores evidence of narcotics sales at Rio Linda. Detective Oliver believed Cathey was a coconspirator.

A search warrant was signed on January 25, 2007, and executed on January 30, 2007.

Mason attempted without success to challenge the search warrant prior to the preliminary examination. In July 2008, Mason was held to answer on all charges except a weapon enhancement on count two.

In August 2008, Mason filed a motion to traverse the affidavit in support of the search warrant and to suppress evidence, along with exhibits in support. Mason claimed Detective Oliver's affidavit "contains reckless and intentional misrepresentations, actions, and omissions without truth to mislead the magistrate." Mason later filed a supplement, consisting of a declaration by his investigator, Lori Brown.

Specifically, Mason alleged the statement that Mason was seen entering the front door of Rio Linda without knocking or waiting to be let in was a reckless falsehood, in that it would have been "physically impossible" to make that observation without standing directly in front of the door. Mason also alleged the failure to "disclose" that officers did not actually observe the CRI enter and exit the door of Delta was a reckless omission in that the affidavit did state the CRI was under constant surveillance.

The prosecution filed an opposition to Mason's motion, and Mason filed a reply. The prosecution then filed an amended opposition to the motion.

The motion was heard on September 3, 2008. After hearing arguments of counsel, the trial court (Judge Bakarich) denied the motions regarding the search warrant. The court explained: "I've read the search warrant. I've got a statement of a person the officers see leaving that house on Delta Street, found to be in possession of drugs, stating that he bought the drugs from the person in that house, your client. He knows him, and he knows that he drives a Cadillac Escalade. [¶] I've got surveillance by officers who follow that vehicle from Delta . . . to . . . Rio Linda . . . on numerous occasions. The vehicle is left there overnight. The vehicle, your client is seen getting into that vehicle on one of these occasions. [¶] The person who subscribes to SMUD at that address has the same last name as your client. There's a nexus between [Rio Linda], [Delta], your client and the selling of drugs. Just from that alone. And it's all within the month of January, I

9

believe, January of '07. [¶] . . . [¶] You have to show that the affidavit includes false statements made knowingly and intentionally or with reckless disregard for the truth and, two, the most important part, that the allegedly false statement is necessary for the finding of probable cause. [¶] So based on what you've told me today, if I were to exclude those portions of the search warrant that they saw the occupants of the Escalade enter [Rio Linda] without knocking or without using a key, if I were to exclude all of those in the affidavit, I would still find that there's sufficient probable cause for the finding of a search warrant on all those addresses. [¶] Even if I were to exclude the controlled buy, I would still find that there's sufficient probable cause for the issuance of a search warrant but I'm not excluding the controlled buy."

In March 2009, Mason filed a motion to suppress evidence, traverse and quash the search warrant or, in the alternative, reconsider the prior ruling. The motion was heard in May 2009. The trial court (Judge Davidian) found that Mason had received a "full and fair hearing by Judge Bakarich" and that there had been sufficient ground for the ruling against Mason.

*Analysis*

"A defendant has a limited right to challenge the veracity of statements contained in an affidavit of probable cause made in support of the issuance of a search warrant. The trial court must conduct an evidentiary hearing only if a defendant makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause. Innocent or negligent misrepresentations will not support a motion to traverse. [Citations.] A defendant who challenges a search warrant based on omissions in the affidavit bears the burden of showing an intentional or reckless omission of material information that, when added to the affidavit, renders it insufficient to support a finding of probable cause. [Citations.] In either setting, the defendant must make his showing by a preponderance

10

of the evidence, and the affidavit is presumed valid." (*People v. Scott* (2011) 52 Cal.4th 452, 484, italics omitted.)

If the defendant makes the requisite showing, "and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing." (*Franks*, *supra*, 438 U.S. at pp. 171-172, fn. omitted.) In short, a defendant is entitled to an evidentiary hearing only if he "makes a substantial showing that (1) the affidavit contains statements that are deliberately false or were made in reckless disregard of the truth, and (2) the affidavit's remaining contents, after the false statements are excised, are insufficient to support a finding of probable cause." (*People v. Panah* (2005) 35 Cal.4th 395, 456.) Those contents support probable cause if they give the magistrate a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. (*People v. Kraft* (2000) 23 Cal.4th 978, 1040.)

The trial court's finding that Mason failed to make the showing required by *Franks*, and its denial of a hearing, are subject to de novo review. (*People v. Box* (1993) 14 Cal.App.4th 177, 183.)

*Four Entries to Rio Linda*

Mason claims he made a substantial showing the affidavit's four statements that *Mason and Cathey were seen entering Rio Linda without knocking* were false. He relies in part on investigator Brown's declaration that "the only vantage point that allows vision to the front door of the residence is by standing directly in front of the door," and that the door is 3.5 to 4.5 feet from the front wall.[4] Mason also relies on his own declaration that

---

**4** Investigator Lori Brown's declaration stated in relevant part:
"I have observed by walking around [Rio Linda] that the only vantage point that

11

neither he, nor Cathey, nor other residents of the complex ever saw an officer standing at a location that afforded a sufficient view of the front door. In addition, Mason relies on Detective Roman Murrietta's handwritten surveillance note indicating defendant and Cathey returned to the "yellow duplex behind 3625 Rio Linda Blvd -- both to entry way."[5]

Mason's evidence suggested that Rio Linda's *front door* was not visible from a location where officers could conduct surveillance while remaining undetected by the targets of the investigation. However, Mason's evidence did not reveal whether *persons standing outside the door, knocking and awaiting admission,* would similarly be out of view and earshot of adequately-concealed officers.

Specifically, Brown's declaration that the door was 3.5 to 4.5 feet from the building's front wall in some unstated direction raised only a speculative possibility that the building would conceal, not just the door itself, but also any persons who remained outside the door until it was opened for them. Nor did Brown's declaration suggest anyone could depart from the area just outside the front door on an alternate route, without entering the door or the officers' field of vision.

Thus, if officers observed defendants approach the door and promptly disappear from view without making what appeared to be knocking motions and without appearing

---

allows vision to the front door of the residence is by standing directly in front of the door.

"The walkway from the front wall of the building at [Rio Linda] to the door is [3.5] feet. There is a pillar on either side of the door that adds at least 1 foot to the distance.

"The distance from the front door of 3623 Rio Linda Blvd., which is directly across from [the Rio Linda residence] is 42.9 feet.

"The width of the driveway is 16 feet.

"The length of the driveway is [86.5] feet."

[5] Mason also relies on Detective Oliver's handwritten note that Cathey and Mason "entered the home." This court is unable to make out all of the words in Detective Oliver's notes and thus cannot determine that Mason's interpretation is correct.

to linger outside the door, and if the officers heard no sounds associated with knocking on a door, the officers could fairly infer that they had observed defendants in the process of entering without knocking or waiting to be let in. Mason has not shown the challenged statements were deliberately false or made in reckless disregard of the truth. (*People v. Scott*, *supra*, 52 Cal.4th at p. 484.)[6]

As ably and succinctly observed by Judge Bakarich after hearing and denying Mason's *Franks* motion, and echoed by Judge Davidian prior to trial, even if the four unassisted entries to Rio Linda are excluded, the affidavit gave the magistrate a substantial basis for concluding a fair probability existed that a search of Rio Linda would uncover evidence of wrongdoing. (*People v. Kraft*, *supra*, 23 Cal.4th at p. 1040.) The affidavit contained abundant evidence that defendants were conducting drug sales from Delta and the Escalade. Defendants were observed taking the Escalade from Delta to Rio Linda. The same day, Mason drove the Escalade from Rio Linda, engaged in two apparent narcotics transactions, and returned to Rio Linda. The Escalade was parked at Rio Linda when surveillance resumed the next morning. A few weeks later, officers observed Cathey drive the Escalade from Rio Linda to Delta, leave Delta and engage in an apparent narcotics transaction, and return to Rio Linda. Two weeks after that, officers again saw Mason at Rio Linda. Thereafter, officers conducted a controlled buy from Mason at Delta. This evidence, plus the fact the Rio Linda SMUD account was in the name of a person with the same surname as Mason, raised a fair probability defendants

---

[6] Mason's reliance on Detective Murrietta's surveillance notes is misplaced. Facts omitted from the notes could have been supplied to Detective Oliver during a postsurveillance conversation between Detective Oliver and the officers who had observed the first three entries (Detective Oliver observed the fourth entry). Because Mason bore the burden to show Detective Oliver's statements were deliberately false or made in reckless disregard of the truth, it was up to him to negate the possibility Detective Oliver had discussed the first three entries to Rio Linda with the officer or officers who had made the observations. This Mason has not done.

were using Rio Linda, as well as Delta, for their narcotics operation and evidence of that activity would be found at Rio Linda. Mason's argument that defendants' narcotics activity at Delta cannot be considered when evaluating probable cause for Rio Linda is illogical and has no merit.

Mason disagrees, claiming the foregoing information "is suspect" in light of the claimed " 'lying or reckless inaccuracy' " we have already discussed. (*People v. Kurland* (1980) 28 Cal.3d 376, 386.) Having found no evidence of lying or reckless inaccuracy, we reject Mason's contention.

In any event, the affidavit did not show -- and Mason does not contend -- that there was *any* evidence, other than the entries without knocking or waiting to be admitted, that Mason personally had any reasonable expectation of privacy at Rio Linda, " ' "either by reference to concepts of real or personal property law or understandings that are recognized and permitted by society." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 255, quoting *Minnesota v. Carter* (1998) 525 U.S. 83, 88 [142 L.Ed.2d 373, 379].) The mere facts he shared a surname with the SMUD subscriber and with some juveniles found during the search are manifestly insufficient for that purpose. Had Mason succeeded in challenging the disputed passages, he perversely would have negated his reasonable expectation of privacy and thus defeated his Fourth Amendment claim as it relates to Rio Linda.

*Surveillance of CRI at Delta*

Mason claims he made a substantial showing the affidavit (1) deliberately or recklessly included the false statement that the CRI had been kept under "constant surveillance," and (2) intentionally or recklessly failed to state that no surveillance team member visually observed the CRI entering or exiting from Delta. Mason claims the statements the CRI "was kept under constant surveillance," and the CRI " 'approached' " and later " 'left' " Delta, falsely suggested the CRI was seen "entering and exiting the

14

house," even though one officer lost sight of the CRI and the other officer saw the CRI walk only " 'to' " the door. We are not convinced.

The affidavit described the officers' observations of the CRI at Delta as follows: "[Detective] Nasca met with CRI. CRI and CRI's vehicle, were searched by a member of law enforcement for any contraband or money. None was found. CRI was furnished with pre-recorded official funds with which to purchase drugs/narcotics. *From this point on, the CRI was kept under constant surveillance by Nasca or other officers.* The CRI was then followed to the area of [Delta]. *The CRI was kept under surveillance from the time that the informant left the presence of Nasca and other officers till such time as CRI approached* [*Delta*]. A short time later, CRI left [Delta] and was followed out of the area to a predetermined meeting location by Officers. At this point in time, CRI handed Nasca the suspected cocaine base. . . . CRI told Nasca that CRI had used the pre-recorded official funds to purchase an amount of cocaine from [Mason] while inside [Delta]." (Italics added.)

The affidavit's statement that, "[*f*]*rom this point on*, the CRI was kept under constant surveillance" precisely identifies the surveillance's *beginning* (i.e., "this point") but is, at best, vague as to its *end* (i.e., "on"). (Italics added.) However, this vagueness is cured, and the end point is precisely identified, in the ensuing statement that "[t]he CRI was kept under surveillance from the time that the informant left the presence of Nasca and other officers *till such time as CRI approached* [*Delta*]." (Italics added.) No reasonable magistrate would read "[f]rom this point on" in isolation from "till such time as CRI approached [Delta]," and thus conclude the surveillance continued "on," *even after the CRI approached Delta,* until he crossed its threshold. Thus, contrary to Mason's argument, the affidavit's failure to reiterate the officers did not see the CRI cross the threshold of Delta was not a material omission.

In any event, a magistrate who was told more explicitly that the CRI had been seen approaching Delta and then leaving Delta, but had not been seen crossing Delta's

15

threshold, could *do no more than speculate* that, contrary to the CRI's statement to Detective Nasca, the CRI had obtained the cocaine from a supplier other than Mason at a location other than Delta.

As Mason concedes, investigator Brown determined that, while the front door of Delta generally was free of "vision obstructions," there was "a large oak tree directly in front of the front door making vision of the front door somewhat blocked standing directly in front of the door." Thus, the tree -- the sole obstruction -- did not give the CRI sufficient cover to arrange and consummate a drug purchase elsewhere in the neighborhood. At most, the tree would have allowed the CRI to make the purchase from someone other than Mason *who serendipitously was lurking behind the tree*. The utter absurdity of this scenario makes plain why the omission was not material to the determination of probable cause to search. Mason's *Franks* motion was properly denied by Judge Bakarich and echoed by Judge Davidian.

## II

Cathey contends her trial counsel rendered ineffective assistance when, without explanation, he withdrew his previous joinder in Mason's *Franks* motion. We disagree.

"[A] conviction will not be reversed based on a claim of ineffective assistance of counsel unless the defendant establishes *both* of the following: (1) that counsel's representation fell below an objective standard of reasonableness; *and* (2) that there is a reasonable probability that, but for counsel's unprofessional errors, a determination more favorable to defendant would have resulted. [Citations.] If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails. Moreover, ' "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." [Citation.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126, quoting *People v. Cox* (1991) 53 Cal.3d 618, 656, original italics.)

16

In this case, the issue of prejudice is dispositive. In part I, *ante*, we determined that the trial court's denial of Mason's *Franks* motion was not error. Cathey could not possibly have suffered prejudice from her trial counsel's refusal to join in the meritless motion.

## DISPOSITION

The judgment is affirmed.


                                        NICHOLSON     , J.



We concur:



    BLEASE     , Acting P. J.



    BUTZ     , J.

17